### J. M. MAYES v. THE STATE.

*No. 743.   Decided December 16.*

1. **Murder—Placing Eye-Witnesses on the Stand.**—On a trial for murder, where the State has called and examined some of the eye-witnesses to the killing, she can not be required to call and place upon the stand other eye-witnesses who are near relatives and intimate friends of defendant, and thereby make them her witnesses.

2. **Same—Argument of Counsel.**—When the court had refused, upon request of defendant, to require the State to put certain eye-witnesses who were relatives and friends of the defendant upon the witness stand, *Held*, that it was not error for the District Attorney to comment upon the fact that defendant himself had not placed said witnesses on the stand.

3. **Same—Charge—Harmless Error.**—On a trial for murder, where in submitting the law of murder in the first degree the court in its charge submitted whether there were former grudges and enmities between the parties, and it was objected that there was no evidence suggesting such issues, *Held*, the jury having found that the murder

was not upon express malice, but was murder of the second degree, and affixed the lowest penalty for that crime, the error was harmless.

4.  Same—Impeachment of Witness for Truth and Veracity.—In impeaching a witness for truth and veracity, the impeaching witness may be asked whether the general reputation of said witness is good or bad, or he may be asked "whether that general reputation is such as to entitle the witness to credit on oath." Following Griffin v. The State, 26 Texas Crim. App., 157.

5.  New Trial—Prejudiced Juror—Verdicts.—Where one of the grounds of the motion for a new trial was that one of the jurors had said before he sat on the trial that Mayes, the defendant, "ought to have his d—d neck broke," which imputed statement the juror denied under oath, but stated that his remark was "they would keep hauling him on the jury until he would get a chance to break some one's neck," and it was shown that said juror did not know either the defendant or deceased nor the facts of the case, and further, that he was an upright and honorable man, *Held,* verdicts solemnly rendered under oath are not to be lightly set aside because of some casual remark made by one before being impanelled as a juror, where no prejudice is shown otherwise to exist.

6.  Evidence Conflicting—Practice on Appeal.—On appeal, if there be sufficient evidence to support the judgment, the court will not reverse because the evidence is conflicting.

APPEAL from the District Court of Bell.  Tried below before Hon. W. A. BLACKBURN.

This appeal is from a conviction for murder of the second degree, the punishment being assessed at five years' imprisonment in the penitentiary.

A sufficiently fair condensed statement of the facts is found in appellant's brief, as follows:

The evidence shows that appellant was deputy city marshal in the town of Belton on March 11, 1893, and had been for several years previous to that time.  That on the night of the 11th of March, 1893, the city marshal was absent from town and appellant had charge of the office of marshal.  That about 12 o'clock on said night appellant was on his way home, and as he was passing the Buckhorn saloon Mr. Jones, the bartender in said saloon, called him and told him to come get his meat.  Appellant was in the habit of leaving his breakfast steak in Jones' ice chest, and it was appellant's custom to come by after it before going home.  Appellant went in and got his meat and put it in his overcoat pocket.  There was a barber shop inside of the saloon building and separated from the saloon proper by a partition wall, with one door opening on the north sidewalk and another opening into the saloon.  When appellant went into the saloon, deceased and John Hammersmith were near the barber shop, and Hammersmith was insisting on being shaved.  O'Riley, one of the barbers, refused to shave him, because it was after 12 o'clock, and told him it was a fifty-dollar fine to shave a man after that hour.  Hammersmith replied that he was not short on money, and would pay the fine.  O'Riley then

proffered to go to his home and shave him on the next morning, but told him he could not shave him then, as it was after 12 o'clock, and he must close up. At this time Mr. O'Riley remarked, "There is the marshal now," referring to appellant. Appellant then said, "Yes, boys, it is time to close up." Hammersmith remarked to him, "What in the hell have you to do with it?" Mayes said, "I have enough to do with it to see that everything is closed at 12 o'clock." Hammersmith then said, "You are a damn fine specimen of city authority." Mayes said he did not want any trouble with Hammersmith. At this time deceased said, "Why don't you whip him?" and started toward appellant, and told him if he would pull off his "gun" he would whip him. Mayes pulled his pistol out of his pocket as if to use it as a club with one hand, and pushed deceased back with the other. Then they were parted. George Evans held deceased, while O'Riley took appellant out at the back door of the saloon. Deceased tried to pull loose from Evans and follow appellant. While on the outside, O'Riley and appellant had a conversation. O'Riley says this is the conversation they had, to wit: "I said to Mayes, 'Let it drop and have no fuss.' Mayes said, 'Well, keep Russell away from me; I don't want to take the worst of it.'" They then returned to the saloon, and as soon as they got inside the door deceased rushed at appellant, and O'Riley caught deceased and threw him between two billiard tables and held him. The bartender then told appellant to go out, and he went out, and the bartender immediately shut the door and locked it. When appellant got on the outside of the saloon he said to John Perry, "Go after Pink, and go quick," meaning Pink Denman, deputy sheriff, who was at the jail a short distance from them. Perry started toward the jail. Just after the door was closed Hammersmith said, "Russell [meaning deceased], get a gun and fight him right."

Hammersmith denies making this statement, but the other witnesses say he did make it. Hammersmith admits he was "full." Deceased then asked Jones, the bartender, for a pistol, and Jones said he did not have one. Jones says when deceased asked him for the "gun" he spoke it in a loud and excited tone, and when he told him he did not have one, he spoke it in an ordinary tone. Jones says deceased then said, "I can whip the damn son-of-a-bitch anyhow," and broke for the door. Hammersmith and Jones grabbed him, but he broke loose from them and caught hold of the door and gave it a wrench with such force that it broke the glass in the door and the door came open. When the glass broke, it fell on the floor and made a loud crashing noise. Deceased rushed through the door toward appellant, saying, "I'll beat his damn face off of him," and appellant fired, and deceased went north, then straightened himself, turned facing appellant and threw his hands to his breast, and appellant fired again. The shots were in quick succession. As soon as appellant shot the last shot, he

said: "Boys, I have done it; come and get me." Appellant surrendered to W. J. Stone, and as they were going to the jail (immediately after the shooting) appellant said to Stone, "I am sorry that it happened," or "I hated to have to do that." Appellant says he heard Hammersmith tell deceased to "get a 'gun' and fight him right," and heard deceased ask Jones for a pistol, but did not hear Jones' reply. He also heard deceased say, when he came through the door, that "he would beat his damn face off of him." Deceased and appellant were friends up to the difficulty. Appellant had said nothing to deceased until deceased spoke to him. There are no contradictions to the above statement of the facts except as to John Hammersmith as above stated. The only material contradictions, if any, are those as to what appellant said and did on the outside of the saloon, and as to George Evans' going out the door with deceased at the time deceased was shot.

Thomas O'Brien testified substantially as follows: That he, in company with Frank Ellington and C. C. Hartley, was passing the Buckhorn saloon about 12 o'clock, and just as they passed the saloon he saw Geo. Evans standing on the sidewalk holding Mayes and telling him to hold on. Mayes replied: "No, by God, if he comes out I'll kill him." Mayes had his pistol waving it over his head, and Evans was trying to catch it, and had hold of Mayes' arm. They did not stop, but went on down the street, and when they had gotten in the middle of the street between Coop's and Cook's corner, they heard two shots fired. Mayes had arrested him and put him in the calaboose for being drunk. I did not tell Jake Bruce that we had sworn falsely on the habeas corpus trial of this defendant. I did not tell Jake Bruce that Ellington had gotten me into it. I did tell Bruce that if Ed Holtzclaw, the marshal, and Joe Mayes did not watch out, Ellington would kill them both. (See testimony of Jake Bruce, who says O'Brien told him those things, which he denies having told him.)

Frank Ellington testified for the State substantially as follows: Thomas O'Brien, Hartley, and himself left the Traders' saloon at about 12 o'clock to go to the Commercial hotel. They passed by the Buckhorn saloon, and when they got to the north side door Joe Mayes and O'Riley were standing on the sidewalk. O'Riley had his hand on Mayes' shoulder, and Mayes said: "If you don't keep him away from me, I'll kill him." Mayes had his pistol out in his hand hanging by his side, but did not have it over his head. Mayes was not waving his pistol when I passed. O'Brien, himself, and Hartley were walking side by side when we passed Mayes and O'Riley. He did not see Mr. Patterson or any one else ahead of them. They were about 127 yards from where they saw O'Riley and Mayes, between the Coop corner and Commercial hotel, when the shots were fired. Mayes had arrested him twice for being drunk, and put him in the calaboose. O'Brien was pretty drunk that night.

C. C. Hartley testified substantially the same as did Frank Ellington, except he says they had gotten to the Cook corner instead of the Coop corner when he heard the shots. Joe Mayes had put his calf in the pound.

Frank Johnson testified for the State, substantially, that he was at Hunt's saloon playing dominoes until 12 o'clock, and at that time the saloon was closed and he left, and Ellington, O'Brien, and Hartley came on behind him. That he passed the Buckhorn saloon and saw Joe Mayes about half-way from the corner and the north side of the door coming toward him, and heard him say: "If the son-of-a-bitch comes out and jumps at me, I'll kill him." That two men were following Mayes, and were near him when he made this remark. Five or six men were standing near the north side door of the saloon. That he went right on home, and as he was going up the stairs to his room he heard two shots fired; that he went on in his room and went to bed. "I know the old man who used to cook at Mr. Pecora's; he slept in the same room with me. Another man, a stone cutter, was sleeping in the room at the time. I do not know where he is now."

Defendant's witnesses contradict these last State's witnesses in several important particulars, but we do not deem it necessary to reproduce the contradicting evidence.

Appellant's bill of exceptions number 1 discloses the fact that the court refused to grant appellant's motion to have Tink Perry, Ed Yates, and Ned Chaney placed on the stand to testify. These witnesses were present in the saloon, and were in a position to have seen and heard all that occurred in the saloon from the beginning to the end of the difficulty between appellant and deceased.

This bill of exceptions also complains of the remarks of the district attorney in his closing argument, with reference to the failure of these witnesses to testify. He said: "Why did not the defendant put Mr. Perry, Mr. Yates, and Ned Chaney on the stand? Mr. Yates is the son-in-law of the defendant, and the other witnesses in the saloon that night were defendant's friends; he was in the very nest of his friends. Mr. O'Riley was Mr. Yates' partner; that is why we did not put the witnesses on the stand." Appellant's counsel promptly objected to these remarks, because counsel had no right to refer to or comment on these witnesses who had not testified.

Frank Johnson testified, in behalf of the State, that he passed the Buckhorn saloon just before the shots were fired that killed Russell Embree, and that as he was passing the saloon he saw appellant on the outside of the saloon, and heard him say, "If the son-of-a-bitch comes out and jumps at me, I'll kill him." For the purpose of impeaching this witness, appellant placed upon the stand J. N. Galliger, Cliff Torrence, and G. N. Davis, who testified that they were well acquainted with the general reputation of Frank Johnson in Waco, his

former home, for truth, and that it was bad. Appellant's counsel then asked each of said witnesses this question: "From that general reputation, is he worthy of belief upon his oath?" The district attorney objected to this question, because improper, and the court sustained the objection and refused to permit the witnesses to answer it.

It is made one of appellant's grounds for a new trial that R. A. Center, one of the jurors in this case, was guilty of corrupt conduct, in this, that when tested on his voir dire as to his qualifications to serve as a juror, the said R. A. Center stated that he was not biased or prejudiced against appellant, and had neither formed nor expressed an opinion as to appellant's guilt or innocence.

To establish the falsity of the statement of this juror, this ground of the motion for a new trial is supported by the affidavit of W. R. Burks, in which he makes the following statement, to wit: "I live in Bell County, Texas. I was drawn and summoned on the J. M. Mayes venire in the District Court of Bell County, Texas, July Term, 1893, to appear August 21, 1893, wherein J. M. Mayes was charged with the murder of Russell Embree. I know one R. A. Center. I have known him about six years. He is a warm friend of mine. The R. A. Center mentioned is the same man who sat on the said J. M. Mayes case as juryman, tried at the present term, being number 5223. Mr. Center was also drawn and summoned as a venireman on said cause, to appear August 21, 1893." Affiant and the said R. A. Center, while on their way to Belton, Texas, from their homes, on the morning of the 21st of August, 1893, to answer their said summons, had a conversation with each other respecting the Mayes case; that in said conversation the said R. A. Center stated to affiant that he would like to get on the Mayes jury. "I asked him why, and he said, 'I'll get to make my hash.' R. A. Center then asked me what I thought they would do with him (meaning the said J. M. Mayes). I replied that I didn't know. I then asked him what he thought they would do with him, and he replied that he thought he (meaning the said J. M. Mayes) ought to have his damn neck broke."

In answer to this affidavit the State files the affidavit of R. A. Center, who denies that he made the statement Burks says he made. But in his affidavit he admits having a conversation with Burks as he was coming to Belton in obedience to a summon as venireman in the Mayes case, and in that conversation he says he told Burks that he hoped they would use him on the juries so he could make his expenses, and that they would keep on hauling him down on these juries until he would get a chance to help hang some son-of-a-bitch. He further says that all he said was in a jocular manner, and with reference to all the venires he was on. In support of this affidavit the State filed the affidavit of W. R. Burks, who says he had always regarded R. A. Center as an honest man, and still so regards him as such. Center, in his

affidavit, also stated that at the time of the conversation between Burks and himself he, affiant, had no acquaintance with Mayes, the defendant, nor with Russell Embree, the deceased, and knew nothing whatever at the time of the facts in the Mayes case, nor of any other case in which he had been summoned as a venireman, none of the cases having originated in his portion of the county, it being twenty-five miles west of Belton and near the county line where he had his place of residence. That he did not then have, nor has he now, any bias or prejudice against the defendant, J. M. Mayes.

*McMahon & McMahon, W. W. Hair,* and *Wimbourn Pierce,* for appellant.—1. It was the duty of the court to have required the prosecution to place the eye-witnesses Yates, Perry, and Chaney on the stand to testify. Hunnicutt v. The State, 20 Texas Crim. App., 639; Thompson v. The State, 30 Texas Crim. App., 325.

2. The court erred in the nineteenth paragraph of the charge in submitting questions as to antecedent malice, previously existing enmity, and grudges between the parties, when there was no evidence of any such conditions—the testimony showing that on the contrary deceased and defendant were good friends up to the beginning of the difficulty. The charge was excepted to generally. Code Crim. Proc., art. 677; Willson's Crim. Stats., secs. 2335, 2337.

3. It was error for the court to refuse to permit counsel for defendant to ask the witness he had called to impeach the witness Frank Johnson, if "from that general reputation, is he worthy of belief on oath?" As far as we have been able to ascertain, this question came before our courts of last resort for the first time in the case of Boon v. Weathered, 23 Texas, 675, and after a very exhaustive research into the authorities, Judge Bell states the rule to be, "inquiry should practically be restricted to the general character of the impeached witness for truth. * * * If the impeaching witness states that he is acquainted with the general reputation of the impeached witness for truth in the community where he lives, he may then properly be asked whether that general reputation is such as to entitle the witness to credit on oath. * * * Any other form of words may be used which do not involve a violation of the cardinal principles that the inquiry must be restricted to the general reputation of the impeached witness for truth in the community where he lives or is best known, and that the impeaching witness must speak from general reputation and not from his own private opinion." This is still the rule in this State, and as authority we call this court's special attention to the following decisions: Marshall v. The State, 5 Texas Crim. App., 293; Holbert v. The State, 9 Texas Crim. App., 219; Griffin v. The State, 26 Texas Crim. App., 163. Then, if these decisions lay down the law of this State, this appellant has been deprived of a legal right, and

having properly saved his bill of exception, he is entitled to have this conviction set aside.

4. The court should have granted the new trial on account of the bias and prejudice of the juror Center. Long v. The State, 10 Texas Crim. App., 198; Henrie v. The State, 41 Texas, 579; Hanks v. The State, 21 Texas, 527; Sewell v. The State, 15 Texas·Crim. App., 62; Graham v. The State, 28 Texas Crim. App., 583.

5. We submit that the evidence is insufficient.

(1) No murder is shown, but the facts show a case of justifiable homicide in self-defense.

(2) If culpable homicide is shown, it is of no higher grade than manslaughter.

*X. B. Saunders*, for the State, filed a most interesting and able argument upon the facts.

*R. L. Henry*, Assistant Attorney-General, for the State.—1. The appellant contends that the homicide is justifiable. The State contends that the facts show murder, and there is an abundance of evidence to sustain a verdict for murder in the second degree. Deceased, Russell Embree, and Mayes had had a wordy altercation in the saloon a short time before the killing. Mayes had drawn his pistol in this altercation, and tried to use it on Embree. They quarreled and tried to fight, but were separated; that is all. Mayes was taken out of the saloon, soon returned, and another altercation was about to ensue. Mayes was again removed from the saloon, or went voluntarily. It is established by the evidence that defendant did not have the nerve to fight the boy with his fist, but preferred to murder him rather than to get his face bruised a little or to arrest him. The homicide was not necessary, and Mayes never thought so, and the jury did not think so. Hooper v. The State, 30 Texas Crim. App., 415; The State v. Webb, 41 Texas, 67.

2. The court fully charged the jury that they must view the killing from appellant's standpoint, and charged according to the approved precedents. It was not necessary to repeat the charge by giving the requested charge. Garrello v. The State, 31 Texas Crim. Rep., 56; Maxwell v. The State, 31 Texas Crim. Rep., 119; Nalley v. The State, 28 Texas Crim. App., 387; Gonzales v. The State, 28 Texas Crim. App., 130; Willson's Crim. Stats., sec. 1070. The Nalley case is squarely in point.

3. The court did not err in not requiring the State to put all the eye-witnesses on the stand. The remarks of the district attorney were proper. Appellant did not ask the court to disregard them even if they were improper. Willson's Crim. Stats., sec. 1055; Hunnicutt v. The State, 20 Texas Crim. App., 626; Phillips v. The State, 22 Texas

Crim. App., 139; Gibson v. The State, 23 Texas Crim. App., 414; Ex Parte Smith, 23 Texas Crim. App., 140; Garrello v. The State, 30 Texas Crim. App., 61.

4. The facts show murder, and the court properly submitted both degrees of murder to the jury. A perusal of the record sustains this proposition. Parker v. The State, 22 Texas Crim. App., 109; Neyland v. The State, 13 Texas Crim. App., 536; Willson's Crim. Stats., secs. 1060, 1064.

5. The sufficiency of the court's charge on self-defense has been discussed supra—proposition 2. Nalley v. The State, 28 Texas Crim. App., 387.

6. The only proper way to impeach a witness on account of his general reputation is to prove by witnesses who know his general reputation what that reputation is. When this is done the ends of justice are accomplished, and the court does not injure a defendant by refusing to let the examination proceed further. 1 Greenl. on Ev., sec. 461, is in point; Willson's Crim. Stats., sec. 2513, and many cases cited.

7. Appellant asks for a new trial on account of the misconduct of the juror R. A. Center. Center positively denies the charges, and makes an affidavit to that effect. No injury is shown. The juror shows that he was a fair juror and uninfluenced by any improper motives. This is not a case of a juror impeaching his verdict, but an attempt is made to show that he was an improper juror. For this to be made available, it must be clearly shown that he made the remark and that it was injurious to appellant in some of his substantial rights. Thomp. on Trials, secs. 2611, 2612, and many cases cited; Willson's Crim. Stats., secs. 2545, 2546; Weatherford v. The State, 31 Texas Crim. Rep., 530; Long v. The State, 32 Texas Crim. Rep., 140.

SIMKINS, JUDGE.—Appellant was convicted of murder in the second degree and his punishment assessed at five years, from which he appeals.

1. Appellant complains that the court erred in not requiring the State to place three witnesses on the stand who were shown by the testimony to be present during the quarrel and subsequent homicide. There is nothing in the proposition, certainly, as applied to this case. In the first place, there were eye-witnesses placed on the witness stand by the State; and in the next place, to require the State to put all such witnesses on the stand, and thereby vouch for their credibility, without regard to their interest, bias, or character of testimony, would compel the State to offer testimony often utterly contradictory, and deprive her of the right of attacking the character of such witnesses, however notoriously bad. It appears that in this case the witnesses in question were the son-in-law and intimate friends of appellant. If

their testimony was advantageous to appellant, we can not see why he did not introduce them.

2. The appellant further complains of the remarks of the district attorney in his closing speech, who asked why appellant did not place the aforesaid witnesses on the stand, as one was the son-in-law and the others were intimate friends of appellant. It seems that after the court overruled the motion of appellant to compel the State to put the said witnesses on the stand the appellant also refused to put them on, and the district attorney commented on the fact. We may infer that they were the appellant's witnesses, summoned by him, and he refused to examine them, and the district attorney had the right to call attention to the fact; and, even if they were not summoned by appellant, we see no impropriety in the argument.

3. Appellant further complains that, in his charge on murder in the first degree, the court erred in submitting to the jury whether there was any previously existing grudge or enmity between the parties, as there was nothing in the evidence suggesting anything of the kind. The jury having found by their verdict that there was no express malice and the lowest penalty inflicted, the charge was obviously harmless. Green's case, 32 Texas Crim. Rep., 298. Again, while there was a general exception to the entire charge on murder in the first and second degrees as not required by the evidence, there was no special exception to the portion of the charge now complained of as error. Quintana's case, 29 Texas Crim. App., 401.

4. Appellant further complains that the court erred in not permitting him to ask certain witnesses. who had testified that the reputation of Frank Johnson for truth and veracity was bad, the further question, "From that general reputation, is he worthy of belief on oath?" In the impeachment of a witness the question to be ascertained is the general reputation of the witness for truth and veracity in his community, and this should be ascertained through impeaching witnesses, without eliciting their private opinions. What is the proper form of inquiry has been the subject of much discussion. This court has held, on the authority of Boon v. Weathered, 23 Texas, 686, that where the impeaching witness states that he knows the general reputation for truth and veracity of the person sought to be impeached, he may then be asked whether that reputation is good or bad, or he may be asked "whether that general reputation is such as to entitle the witness to credit on oath." Willson's Crim. Stats., sec. 2513; Griffin v. The State, 26 Texas Crim. App., 157. In the case of Johnson v. Brown, 51 Texas, 77, the Supreme Court, also on the authority of Boon v. Weathered, declare that the only proper questions to be propounded to the witness are, "whether he knows the general character or reputation of the witness intended to be impeached in point of truth, among his neighbors." If so, then what is that character—good or bad?

These questions were asked, and answered by the witness, and we think were sufficient, and were the proper questions.

5. Appellant asks a new trial on the ground of prejudice and bias on the part of R. A. Center, a juror who tried the case. The evidence shows that Center and one Burks were traveling to Belton; that Center was summoned as a special venireman in four cases, including the Mayes case, and Burks was also a venireman. Some conversation ensued between the parties, in which Center said "he lived so far in the country that he would have to remain until all the venires were called, and he hoped he would be taken on some case to make expenses." But Burks said that Center further said, "Mayes ought to have his d—n neck broke." This Center denies, and says that his remark was "they would keep hauling him on the jury until he would get a chance to help break some one's neck." Without undertaking to settle what was said, it is uncontradicted that Center did not know appellant or deceased, nor the facts of the case, and his remarks were, no doubt, jocular or misunderstood. The juror is shown to be an upright and honorable man by the impeaching witness. Verdicts solemnly rendered under oath are not to be lightly set aside because of some casual remark made by one before being impanelled as a juror, where no prejudice is otherwise shown to exist.

6. While the evidence is conflicting, and many witnesses testified to inconsistent facts, yet we think there is sufficient testimony to sustain the conviction, and it is affirmed.

*Affirmed.*

Judges all present and concurring.