JOE DARTER v. THE STATE.

No. 1455. Decided March 8, 1898.

1. **Murder—Putting Eyewitnesses on the Stand.**

On a trial for murder, it is not error for the court to refuse to require the prosecution to put all the eyewitnesses to the homicide upon the stand so that defendant might have the right to cross-examine them.

2. **Recalling and Further Examining Witness After the State Had Closed and the Witness Had Been Discharged from the Rule.**

It is within the discretion of the court, and will not constitute reversible error for the court after the State has announced that its testimony is closed, to permit the recall and further examination of a witness, who after his previous examination

had been released from the rule. Such action will not constitute reversible error unless there appears to have been a palpable abuse of discretion on the part of the court.

### 3. Murder—Reputation of Deceased.

On a trial for murder, it is not error to refuse to permit defendant to introduce evidence going into particulars of the reputation of deceased as a dangerous man, and allowing proof of incidents where the deceased had engaged in difficulties with deadly weapons.

### 4. Same—Acts and Declarations of Defendant—Res Gestae.

What defendant said and did at the time of his arrest for the homicide, was admissible as part of the res gestae. And if any error had been committed in permitting such evidence, it was cured by the court's charge withdrawing it from the consideration of the jury.

### 5. Same—Charge—Provoking Difficulty—Practice.

On a trial for murder, objections to the charge of the court on provoking the difficulty should be presented by bill of exceptions; it can not be complained of for the first time in this court on appeal.

### 6. Special Instructions—Practice.

Where the court's charge sufficiently covers the issues in the case, it is not error to refuse special requested instructions.

### 7. Murder—Jury Law—Viewing the Locus in Quo—Receiving Other Testimony.

On a trial for murder, where the jury, after they had retired to consider of their verdict, were taken for private purposes to some stalls in the vicinity of, and from which they could and did view the locus in quo of the homicide, and that they discussed the surroundings as they saw them in connection with the truth of the testimony of an important witness for defendant; Held, this was tantamount to receiving other testimony, and it was evidently injurious and hurtful to defendant.

### 8. Improper Conduct of Jury—Receiving Other Testimony.

Where, upon the retirement of the jury and they had agreed that defendant was guilty, but there was a wide diversity as to the punishment they would assess, two of the jurors told their fellows that defendant was an ex-convict, and had been sent to the penitentiary for stabbing a boy in the back; Held, this was evidently receiving other unsworn testimony injurious and hurtful to defendant, and is a statutory ground for new trial and constitutes reversible error.

### 9. Separation of Jury.

Where, on one occasion, some of the jury went into and remained in a saloon while others were away in a back yard attending to a call of nature; and, while the jury were breakfasting, one of the jurors went off some forty steps away to a privy with an outsider, who was a witness in the case, unaccompanied by an officer and out of the sight of the officer and jury, and what occurred between the juror and witness was not investigated or made to appear; Held, such a separation of the jury as constituted a violation of the law.

### 10. Misconduct of Jury.

No emergency would seem to authorize an officer to permit a jury to go into a saloon while they were deliberating.

### 11. Same.

See opinion for animadversions of the court and suggestions to trial courts with regard to separations of juries, and the necessity of admonishing juries against going outside the record in the trial of causes.

Appeal from the District Court of Walker. Tried below before Hon. J. M. Smither.

Appeal from a conviction for murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

The indictment charged the appellant with the murder of one Frank Ward, on or about the 9th day December, 1896, by shooting him with a pistol.

The parties appear to have been friends, who, with one or two other parties, had brought their cotton in wagons from Madison County, where they lived, to Huntsville. The night before they reached Huntsville, deceased and defendant played cards at their camp. When they reached Huntsville, they put up at a cotton yard, and during the day they commenced playing cards again at King's saloon, not far from the cotton yard. They drank quite heavily, and deceased, at least, if not both of them, was quite drunk. They got into an altercation at King's saloon and he finally made them leave there. Some time after night it was finally agreed that they would go down to a little room or house at the cotton yard and play cards there. This house was just at the southwest corner of a broad platform some eighty feet long by sixty wide, which was used for the purpose of delivering cotton, and was called the "cotton wharf." After the parties got into this room or house the deceased refused to let anyone else play in the game except the defendant and himself. After these two had played awhile they commenced to dispute about the count of the game, which was "seven-up," and finally deceased picked up the money and put it in his pocket. Defendant claimed that $2.50 of the money was his, and demanded it. They had words about the money, Darter, the defendant, telling the deceased to put it down. Finally all the parties except the deceased, Ward, got out of the house or room, and went on the cotton wharf or platform. When Ward came out of the house he had a lighted candle in his hand, which went out, and the parties were all in the dark. All the witnesses, both for the State and defendant, testified that the defendant and the deceased were engaged in the controversy about the $2.50 on the wharf for about a half hour, long enough for one of the bystanders to go up town, hunt up an officer, and get him to come down there to stop the difficulty. Ward, it seems, was at first upon the ground, and commenced to climb up on the platform. Darter, defendant, hallooed to the others to catch him and not let him come up on it. Ward succeeded in getting upon the platform and started towards defendant, cursing him for a God-damned son of a bitch. Defendant would stop him by threatening that "if he advanced upon him with his knife, he would kill him." All the time Darter was demanding his $2.50, and Ward was all the time attempting to get to Darter, promising to hand him the money, Darter all the time insisting that he should lay it down on a plank or give it to one of the boys, as he had promised. In a second or so after deceased had called defendant a "God-damned son of a bitch," Darter fired upon him. The officer who was coming to stop the difficulty only saw the flash of the first pistol shot, and was in a few feet of the platform when the second shot was fired. Ward threw up his hands and said, "Don't shoot any more!" and fell from the "wharf" to the ground. Defendant rushed to the side of the platform and fired one or more shots, and started to run. The officer called to him to halt several times, but

he did not do so until the officer had fired at him three times, after which the officer arrested him and found his pistol on him. The physician who examined the dead body testified to two mortal wounds near the left nipple, which caused the death.

With regard to the separation and misconduct of the jury, the facts are sufficiently stated in the opinion of the court, and no additional statement is necessary.

*Randolph, Powell, Ball & Randolph,* for appellant.—The jury in their consideration of the case were a part of the time in charge of the sheriff, and at other times in charge of Horace Hunter; were permitted to separate; were allowed to inspect the cotton wharf and surroundings; were regaled by the recital of prejudicial matters, not in evidence, by various members of the jury; unwarranted statements were made by members of the jury, and in their deliberations showed by their conduct and words that defendant could not at their hands have a fair and impartial trial, as fully appears from affidavits of L. B. Brogden, T. H. Mallett, Robert Ernst, John Gibbs, E. W. Turner, and J. H. Hosea, all of said matters and things being prejudicial to defendant.

It appears from the affidavit of L. B. Brogden, a juror, that the jury went twice to and near the cotton wharf where the killing of Ward occurred. The place where Ward was said to have been killed was pointed out. The jury went in at the gate near the blacksmith shop and down by same and the cotton wharf, and around the wharf, scattered as they went, in plain view of the entire surroundings, one visit being before the case closed and one after it had closed. Also during the progress of the trial the jury were separated two or three times at Hampton's saloon, some being in the rear of the saloon, some in the saloon, and some in the front, the sheriff being in front, where it was impossible to see all of the jury. That one of the jurors, D. W. Henderson, stated in the jury room that he had known or heard of a case where a juryman who was hanging out for acquittal was told the whitecaps would be made to hang him. That one the jurors, Charles Murray, and he thought others, said, "The people of the town all expected the defendant to be convicted, and what would they think of us if we come in with a verdict of five or ten years?" That the jury were told by two jurors, E. W. Turner and S. Holland, of defendant's being an ex-convict for stabbing a boy in the back. That defendant was a bad character and it was best to get him out of the country.

T. H. Mallett makes practically the same affidavit.

Robert Ernst made affidavit that Hosea, a juryman, stated: "I did not consider the testimony of Hiram Stutts, as after we went to the cotton wharf and examined the surroundings we found that from where Stutts claimed he was he could not have seen two men on the wharf where the killing occurred in the positions he said they were."

J. A. Gibbs made affidavit: "That after the jury were impaneled a

juror, Will Robinson, was separated from the jury and officer about twenty minutes, out of sight of said officer and jury."

To controvert these affidavits the State was allowed from the 13th of October to the 16th. The district attorney filed an affidavit of E. W. Turner, the two officers, and jurors Wilson, Hosea, Mallett, and Henderson. The juror Turner's affidavit is explained away by additional affidavits from him, and he does not go to the trouble to deny Brogden's statement "that he told the jury defendant was a bad man and ought to be gotten out of the country." The juror Hosea's affidavit, intended to contradict Robert Ernst, is technical. His additional affidavit shows Ernst's affidavit to be correct. The juror Murray, who stated the people all expected them to convict the defendant, etc., made no affidavit. The juror Henderson, in his affidavit, does not deny statements made by him. The juror Holland, who told the jury "defendant was an ex-convict for stabbing a boy in the back, and was a bad man and ought to be got out of the country," makes no affidavit. The juror Robinson, who was away from the jury twenty minutes, makes no affidavit. And the other jurymen are not accounted for and no reason assigned as to why their affidavits were not procured. The jurors Henderson and Turner not being influenced by what they heard is but natural, they being engaged in the prosecution while in the jury room. Hargrove v. State, 33 Texas Crim. Rep., 431; Ellis v. State, 33 Texas Crim. Rep., 508; Mason v. State, 16 S. W. Rep., 766; Burleson v. State, 15 S. W. Rep., 175; McWilliams v. State, 32 Texas Crim. Rep., 269.

As to the juror Robinson being away from the officer and jury twenty minutes, and the separation of the jury at Hampton's saloon: Code Crim. Proc., art. 687; Robinson v. State, 30 Texas Crim. App., 459; Kelly v. State, 12 S. W. Rep., 505; English v. State, 28 Texas Crim. App., 500.

*Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of twenty-five years; hence this appeal.

Appellant assigns as error the action of the court in overruling his motion to require the State to put all the eyewitnesses to the homicide on the stand, so that he might have the benefit of the cross-examination of said witnesses. This matter has been repeatedly settled by this court against the contention of the appellant. See Reyons v. State, 33 Texas Crim. Rep., 143; Kidwell v. State, 35 Texas Crim. Rep., 264.

There was no error in allowing the State to recall the witness Maxey, nor in permitting the State to introduce the witness Lee. The matters presented in these bills of exception are greatly in the discretion of the trial court, and unless there appears to be a palpable abuse of such discretion, it will not constitute reversible error.

Nor was there any error in refusing to permit the defendant to go into the particulars of the deceased's reputation as to being a dangerous man,

and allowing proof of particular incidents where he had engaged in difficulties with deadly weapons.

The testimony of Maxey as to what the defendant said and did on his arrest was a part of the res gestae of the homicide, and admissible as such. But if it be conceded that this was error, it was cured by the action of the court in withdrawing it from the jury by the charge.

We have examined the court's charge carefully, and do not think it subject to the criticism of counsel for appellant. No objection is urged, either by bill or in the motion for new trial, to the charge given by the court on provoking the difficulty; and, if this was erroneous, it can not be complained of here for the first time. Nor do we agree with appellant that the special charges should have been given. The court's charge sufficiently covered the issues in the case.

Among other things, appellant predicated his motion for a new trial on the ground that the jury were guilty of misconduct while they had the case in charge, and also that they heard additional testimony. This matter appears to have been tried by the court on affidavits pro and con. Appellant furnished a number of affidavits in proof of the grounds alleged by him, and the State replied to those by counter affidavits. Appellant introduced the affidavits of several of the jurors tending to show that they were permitted—in fact carried by the officer having charge of them to the locus in quo of the homicide, which was at a cotton wharf in the town of Huntsville, only a few blocks distant from the court house, and that the jury, while there, were permitted to inspect said wharf and surroundings, which, it is urged, in connection with the testimony, was bound to have an important bearing with the jury, as these physical objects would be considered by them in weighing the testimony of the witnesses. In this connection, it is stated in the affidavits that the physical facts as found by the jury on the ground were used to discredit one Hiram Stutts, an important witness for the defendant. This witness testified to seeing a part of the difficulty, and it is stated in the affidavits that it was observed by some of the jury, at the time they were at the cotton wharf, that Stutts, from his position on the ground, could not have seen what he testified to having seen. This affidavit was made by one J. H. Hosea, who stated that he heard one of the jurors remark—could not say which one—that, with the height of the wharf, Hiram Stutts could not have seen the two men on the northeast corner or part of the wharf, where Ward was said to have been killed, in the position Stutts claimed they were. It is also stated in the affidavits that two of the jurors, E. W. Turner and S. Holland, made the statement in the jury room, while the jury were deliberating on their verdict, that the defendant was an ex-convict, having stabbed a boy in the back, and that he was a bad character, and it was best to get him out of the country. These, we believe, are all the matters presented that can be considered in the nature of testimony heard by the jury after having retired to deliberate upon the case.

We do not understand the testimony of the State to controvert the fact that the jury were carried to the cotton wharf on the two occasions stated by appellant. Indeed, this is admitted; the excuse being that the jurors were carried to some stalls in that immediate vicinity, instead of a privy, for private purposes. Some of the jurors deny that they made any examination of the surroundings; but there is no express denial that the remark was made, as stated in the affidavit of appellant, that one of the jurors stated on the ground that Hiram Stutts could not have seen what he testified to. The witness Hosea, however, who made the affidavit for the appellant, states, in an explanatory affidavit for the State, that he may, at some time since the trial, have said that he did not believe Hiram Stutts' testimony, but that he had never said that it was because he went to the cotton wharf, and made an examination of the surroundings, etc. This is all the denial as to this matter. It is not a denial of his former statement that some other juror on the ground made the observation to which he swore on behalf of the appellant. Nor is it denied anywhere in the affidavits for the State that it was stated by the two jurors, while the jury were deliberating, that appellant was an ex-convict, he having been formerly sent to the penitentiary for stabbing a boy in the back. The affidavits in this regard on the part of the State simply show that this statement was made after the jury had agreed that appellant was guilty of murder in the second degree; but they also show that they had not agreed at that time on the term of punishment, and, in fact, they expressly declare that there was a wide diversity between the jurors as to the amount of punishment. Evidently, this declaration must have been made by those desiring the highest punishment to induce or coerce others more favorably inclined towards the defendant to agree to their terms. We can not but regard the viewing of the locus in quo of the homicide by the jury, and its use in connection with Stutts' testimony, and also the declaration, made before the jury, that appellant had previously been convicted and sent to the penitentiary for stabbing a boy in the back, as in the nature of evidence—unsworn testimony—received by the jury after they had retired to deliberate upon the case; and it was evidently injurious and hurtful to the appellant. Code of Criminal Procedure, article 817, subdivision 7, as has been stated in previous decisions of the court, would appear to be mandatory, and, where the jury has received other material evidence, whether from one of their number or from others, after they had retired to consider of their verdict, will be cause for reversal. See Hargrove v. State, 33 Texas Crim. Rep., 431; Ellis v. State, 33 Texas Crim. Rep., 508; Mitchell v. State, 36 Texas Crim. Rep., 278. We would observe, in connection with this matter, that the sheriff or officer in charge of the jury in any criminal case should be very careful in his handling of the jury when absent from the court, and especially avoid carrying them to any place where the offense is alleged to have occurred. In such case, it would be next to impossible to prevent the jury from considering the locus in quo in connection with the testimony

of the witnesses. Obviously, the impropriety of carrying the jury upon the ground where the homicide happened should have occurred to the officer, and this failure of duty on his part is little short of negligence.

It also appears, by affidavits, that the jury were permitted to scatter. On one occasion some of them remained in a saloon, while others went some little distance into the back yard to attend to the duties of nature. The State's affidavits tend to show that all the jury were within the view of the officer, but this is not made clear. The officer in charge should not have permitted the jury to go into a saloon at all while they were deliberating. No emergency would seem to authorize this. It is also stated, in the affidavit of one Gibbs, that while the jury were breakfasting, or about the time they finished, one of the jurors, to wit, Will Robinson, went with him to a privy, about forty steps from the body of the jury, and that they remained at the privy together about twenty minutes; that they were by themselves, and were not accompanied by the balance of the jury, or the sheriff or his deputy; and they were not in sight of the jury, nor the officer in charge of the jury. Gibbs was a witness in the case. What occurred between them is not made to appear. This affidavit is not gainsaid by the State. This, it seems to us, was a separation of the jury, and was such misconduct as should have been reprehended by the trial court. The matter should have been investigated, and, if the officer in charge of the jury was found negligent in his duties, he should have been punished.

The action of the jurors Turner and Holland, in stating before the jury that appellant had been previously convicted for stabbing a boy in the back, was not only placing before the jury new evidence, but was very suggestive that these jurors were occupying the role of prosecutors in the jury box. But we will not discuss this matter further. The observations we made in the case of Tate v. State, 38 Texas Criminal Reports, 261, are applicable to this case, and we quote from said case as follows: "The record discloses an absolute fairness of trial, and a proper administration of the law up to the submission of this case to the jury, and the reversal is based solely upon their misconduct. It occurs to us that when this matter was presented to the judge below, it was his bounden duty, after the proof was submitted, to have granted a new trial, and not have compelled defendant to seek redress by an appeal to this court. In granting that new trial, he should have definitely ascertained who of the jurors were guilty of thus tampering with justice, and have visited upon such the summary punishment authorized by law as for a contempt of his court. One such punishment, properly visited, would do much to arrest this vicious practice, and to teach jurors a lesson that they should be governed entirely and exclusively by the oath assumed by them when they enter upon the trial of the case; that is, to try the case solely upon the law and the evidence submitted to them. This court has been compelled to reverse not a few cases on account of the misconduct of juries in going outside the record, and then afterwards making affidavits publishing their disregard of the obligations

assumed by them when they were sworn as jurors. We would suggest that the district judges hereafter call the attention of the jury to the oath they have taken, and admonish them against going outside of the record in the trial of any cause, and then, certainly, on a disregard of such admonition, there would be full authority to visit such punishment as would put an end to the practice."

The judgment is reversed, and the cause remanded.

*Reversed and remanded.*