## JOHN PUGH V. STATE.

### No. 2034.   Decided November 27, 1912.

**1.—Murder—Sufficiency of the Evidence.**

Where, upon trial of murder, the defendant was convicted of murder in the second degree which was sustained by the evidence, and the charge of the court, there was no reversible error.

**2.—Same—Evidence—Eyewitnesses—Common Law.**

Under the common law, a rule of law was sanctioned where, by motion filed, the defendant could require the State to introduce all eyewitnesses to the transaction, but this is not the rule under the statutes of this State.

**3.—Same—Motion to Strike Out—Bill of Exceptions.**

Where no bill of exceptions, to the motion to strike out testimony, was reserved at the time to the court's ruling in refusing to do so, there is nothing to review; besides, there was no error in refusing to do so.

**4.—Same—Practice in District Court—Eyewitnesses.**

Where the court refused to require the State to place all eyewitnesses on the stand, but on his own motion, called a witness on the stand and tendered him to both parties who examined him rigidly, there was no error; besides, the State did not wholly rely on circumstantial evidence, but introduced an eyewitness to the transaction. Qualifying Hunnicutt v. State, 20 Texas Crim. App., 632; Thompson v. State, 30 Texas Crim. App., 325. Following Reyons v. State, 33 Texas Crim. Rep., 143, and other cases.

**5.—Same—Charge of Court—Self-defense.**

Where, upon trial of murder, the State's case was sustained by its testimony, and defendant's case was one of self-defense, both of which theories the court fully submitted to the jury, who convicted the defendant of murder in the second degree, there was no error.

**6.—Same—Requested Charges.**

Where some of defendant's requested charges were submitted and others were refused because not applicable to the testimony, there was no error.

**7.—Same—Charge of Court—Limiting Testimony.**

Where the State only asked questions to lay a predicate to impeach the witnesses, but did not follow it up by offering any testimony, there was no error in the court's failure to limit such questions; besides, the court instructed the jury on the impeaching testimony of other certain witnesses and properly limited the same, and there was no error.

**8.—Same—Charge of Court—Self-defense—Manslaughter.**

Where, upon trial of murder, the court properly instructed on the issue of self-defense, and the evidence did not raise the question of manslaughter, there was no error in the court's failure to charge thereon.

Appeal from the District Court of Houston. Tried below before the Hon. B. H. Gardner.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*J. W. Madden* and *C. M. Ellis,* for appellants.—On the question of the insufficiency of the evidence: West v. State, 2 Texas Crim. App,. 460; Walker v. State, 3 id., 70; Walker v. State, 14 id., 609; Templeton, 5 id., 398; Jones v. State, 7 id., 457; Lander v. State, 12 Texas, 462; Ridout v. State, 6 Texas Crim. App., 249; Ward v. State, 30 id., 687; Williams v. State, 2 id., 271; Cochran v. State, 28 id., 422; Anderson v. State, 1 id., 730; High v. State, 26 id., 545; Phillips v. State, 29 Texas, 226; Skaggs v. State, 31 Texas Crim. Rep., 563; Ake v. State, 31 Texas, 416.

On question of introducing eyewitnesses by the court: Chamberlain v. State, 25 Texas Crim. App., 398; Odle v. State, 13 id., 612; Smith v. State, 15 id., 338; Parker v. State, 18 id., 72.

On question of the court's charge: Ward v. State, 30 Texas Crim. App., 687; Skaggs v. State, 31 Texas Crim. Rep., 563; Hall v. State, 66 S. W. Rep., 783.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—Appellant was indicted, charged with murder, and convicted of murder in the second degree, and his punishment assessed at five years confinement in the State penitentiary.

In appellant's first, second, third, fourth, fifth, sixth, twenty-first, twenty-second, and twenty-third assignments of error is presented the question of the sufficiency of the evidence to sustain the verdict, in some of them it being alleged that the evidence is insufficient to sus-

tain the verdict, and in others that the verdict is contrary to the law as given in charge to the jury. Appellant groups them in his brief, and we do so, for if either present grounds of reversal, the whole case must fall.

That appellant killed the deceased is not denied, but it is earnestly insisted that the killing was done under such circumstances that he was justifiable as a matter of law. It appears that deceased was a constable of a precinct in Houston County, and had detected appellant, with others, gambling, and reported them. On this occasion appellant refused to submit to arrest. Later when tried, appellant had a fight with the deputy sheriff about his fine. Between the time of appellant's detection in the gambling game and this killing, appellant was heard to remark that he had two shells in his gun, one for deceased and the other for the deputy sheriff. On the day of the killing appellant used very abusive language, and made threats about what he was going to do to deceased. This, of course, is all from the State's evidence, and the truth of which was passed on by the jury, and we mention it solely on the ground of whether or not the testimony was sufficient to sustain the verdict, and whether the verdict was contrary to the charge of the court. After making these threats, it is shown by John Bobbitt that he was present at the time of the shooting, and he says: "The shooting was done in Jake Gregg's store house in Weeches, Houston County, Texas. I don't know what time of day it was, but it was late in the evening, after the noon hour and before dark. I do not know what caused the trouble, and the first I do know about it I was sitting on a counter in Jake Gregg's storehouse and I heard Jim Robbitt, my brother, tell Luther Show to turn him aloose, and I looked up that way and John Pugh was coming down the aisle and I started up there to where Jim Bobbitt was, and I passed John Pugh and John Pugh went in behind the counter and I taken hold of Jim and me and him started on to the front door, and just as we got a little past the counter I heard a gun cock and I looked back that way and seen the gun coming up over the counter in that position, and I just spoke to Jim and said, 'Jim, look out' or 'Look there' or something to that effect, and Jim kind o' turned his head that way and as he did so the gun come on up, and as it did, I thought he was going to shoot him and I turned my head away and made a step, but he didn't shoot him and I turned back, and as I turned back the gun shot and Jim was falling."

Harvey Smith testified: "He (John Bobbitt) wasn't standing when I saw him, and he wasn't sitting either; he was walking right behind Jim Bobbitt going towards the front door. I reckon they had passed what you would call the middle of the house; and they were going towards the front door. Both of them were facing me, and I was on the inside of the door. They were coming facing me, both of them. Jim Bobbitt was ahead and John Bobbitt was behind. They were on the left hand side of the house as you went in at the front

door; coming up the aisle next to the counter on the left hand side
of the house as you go in the front door. Then Jim Bobbitt was
killed. John Bobbitt was right behind Jim Bobbitt. Jim Bobbitt
was kind o' facing the door when he was shot, but he looked around
towards the gun just as he was shot. I saw him when he looked
around. I saw the gun when it fired. I don't know just how far
he was from the gun, but I would guess two or three feet. I don't
know how far he was from the front door, but he was something
about twelve feet, I suppose.'' If the jury believed the theory of
the State, based on the testimony of these two witnesses and other
facts and circumstances in the case, appellant was not justifiable in
the shooting, and the testimony would amply support the verdict of
the jury.

The State introduced, in its original testimony, only John Bobbitt
as to the facts and circumstances at the time of and immediately
preceding the killing. When the State rested the defendant filed
a motion asking that the State be required to introduce all the eye-
witnesses to the transaction. This motion was by the court overruled,
and of this ruling of the court appellant complains in his eighth, ninth,
tenth, eleventh, twelfth, thirteenth, fourteenth and fifteenth assign-
ment of error. Under the common law, as the defendant could not
introduce any testimony, a rule of law was sanctioned where by
motion filed, the defendant could require the State to introduce all
eyewitnesses to the transaction. In this State there has never been
any reason for such rule, and it has never prevailed. When the
State has closed its testimony, a defendant can introduce such testi-
mony as he desires, and such of the eyewitnesses as the State does
not introduce he can call if he desires to do so.

In his sixteenth, seventeenth and eighteenth assignments of error
appellant complains of the action of the court in overruling his motion
to strike out all the testimony adduced down to the time the State
closed its case. If such motion was made, no bill of exceptions was
reserved to the action of the court in refusing to do so, consequently
the matter is not presented in a way we can review it. However, if
it was properly presented, under Article 698 of the Code of Criminal
Procedure this court has held that the trial court has a wide discre-
tion in the order of admitting testimony. The testimony of the other
eyewitnesses was relied on by appellant to prove that he acted in
self-defense, and it would not have been proper for the court to
have required the State to introduce this testimony, and vouch for
it. The court in this instance stated to appellant he would not re-
quire the State to place the witnesses on the stand, but if it was
desired the court would place the eyewitnesses on the stand, thus
relieving the defendant of the burden of vouching for them, and the
court did place Shaw on the stand, and tendered him to both the
State and defendant, and this witness did testify, being rigidly ex-
amined both by the State and defendant. The court in so doing

evinced a spirit of fairness, and his action is not subject to criticism in this respect. Appellant cites us to the cases of Hunnicut v. State, 20 Texas Crim. App., 632, and Thompson v. State, 30 Texas Crim. App., 325. In the Thompson case it was held that if the State undertook to make its case wholly by circumstantial evidence, it would be proper to require the State to introduce some of the eyewitnesses. In this case the State did not rely wholly on circumstantial evidence, and did introduce one eye witness, and the way he detailed events at the time of the killing is wholly at variance with the testimony of the other eyewitnesses, and yet the jury seems to have accepted his version. In the Hunnicut case Judge White is expressing his individual opinion and so states; and was not speaking for the court, and the views thus expressed never became the law of this State, the reason for the contrary rule being well expressed by Presiding Judge Davidson in the case of Reyons v. State, 33 Texas Crim. Rep., 143. See also McCandless v. State, 42 Texas Crim. Rep., 655, 62 S. W. Rep., 745; Mayes v. State, 33 Texas Crim. Rep., 33; Kidwell v. State, 35 Texas Crim. Rep., 264; Darter v. State, 39 Texas Crim. Rep., 40; Wheelis v. State, 23 Texas Crim. App., 238.

If the evidence offered on behalf of appellant had been believed by the jury it would have presented a case of self-defense. However, the court in his charge presents that question to the jury very favorably to defendant, and in addition thereto gave at appellant's instance the two following special charges:

· "You are instructed that if you believe from the evidence in this case that the defendant and the deceased, Jim Bobbitt, had settled their troubles and differences by mutual agreement before the said Bobbitt was shot, and that the defendant had put his gun away in pursuance of said agreement, believing in, and acting upon the good faith of the said Bobbitt in making the said agreement, and that thereafter the said Bobbitt violated his said agreement and brought on further trouble between himself and the defendant by attacking the defendant and challenging him to further trouble by telling him to 'get his gun,' and that he pursued the defendant to where the defendant had put his gun, with his pistol in his hand, and that the defendant then shot the said Bobbitt under the belief that the said Bobbitt intended to kill him or inflict upon him serious bodily injury, then and in that case you will find the defendant not guilty. And in determining this question you will pass on the same from the standpoint of the defendant as the appearance of danger may have reasonably appeared to him at the time of the shooting, although you may believe there was no *real* danger of such injury.

"You are instructed that if you believe from the evidence in this case that at the time of the killing the deceased was the aggressor, and that he brought on the trouble between himself and the defendant in the house where he was killed, and conducted himself in such way as to lead the defendant to believe that he meant to kill the

defendant, or to inflict upon him serious bodily injury, and that under such belief the defendant shot and killed the deceased, then and in that case you will find the defendant not guilty, and you will so find whether you believe there was any real danger or not, and whether any previous agreement to settle their troubles was made or not, and whether you believe the defendant had previously threatened the life of the deceased or not.''

Thus in two special charges the court directed the attention of the jury to the real issue in the case as made by the testimony offered in behalf of defendant. If, as the State's witnesses testify, deceased was walking away from appellant at the time he was shot, defendant was not justified in killing him. On the other hand the defendant's witnesses would have deceased raising the trouble at this particular time and pursuing appellant, and these charges tell the jury if they found these facts to be true, or had reasonable doubt thereof, to acquit him.

There was no error in refusing special charge No. 3, as it was covered in special charges Nos. 1 and 2, given at appellant's instance. There was no evidence calling for or upon which to base special charge No. 4. The court had told the jury if deceased was advancing on appellant with a pistol, to acquit him, and this was the theory of appellant on the trial, and there was no reason to instruct the jury whether or not deceased was acting in his official capacity.

In cross-examining several witnesses the State's attorney asked them if they had not testified differently on a former trial in this case, apparently laying a predicate to impeach them, but did not follow it up by offering any testimony to impeach them. Appellant complains that the court in his charge failed to limit the purposes for which such questions were asked and testimony would have been admissible. As no testimony was offered, we fail to see the necessity for the court to charge thereon. Where certain testimony was admitted for impeaching purposes the court instructed the jury: ''Certain witnesses for the State have been permitted to testify that certain witnesses for the defendant made certain statements at times and places other than on this trial. Now you are instructed that such testimony cannot be considered by you as proof of any fact against defendant, but same has been admitted in evidence on the issue as to the credibility of said witnesses for the defence on the weight to be given their evidence respectively and cannot be considered for any other purpose.'' It is thus seen that the court fully instructed the jury when any testimony was admitted.

The appellant earnestly insists that the verdict is contrary to the law as given in charge by the court; that if the evidence did not conclusively show he acted in self-defense, then the evidence would show no higher degree of offense than manslaughter. It appears that deceased was an officer, and as such officer had detected appellant gambling, and appellant was compelled to pay a fine. This angered

him, and on several occasions thereafter he had used very abusive language in regard to deceased, and at all times carried a shotgun, saying he had as much right to carry it as the officers did a pistol. It is nowhere suggested or shown that the officer nutured any animosity towards appellant, but the animosity was wholly on his side. On the day of the killing appellant had become unruly on the base ball ground, and when requested to desist, used very offensive language, and threatened to take the life of deceased. From his standpoint, later when the officer went in the store and asked him if he had his gun, and he answered, no, the officer telling him to get it, he made for his gun and shot the officer. He exhibited a disposition and willingness to enter into a deadly combat. The testimony offered by him would suggest mutual combat. If his theory is true, it is remarkable that the officer followed him, firing no shot, and under such circumstances we can readily see how the jury accepted the State's theory of the homicide—that when the trouble arose and appellant made for his gun, deceased and his brother, instead of following defendant, started out of the store and deceased was killed when there was no necessity or apparent necessity viewed from any standpoint.

The judgment is affirmed.

*Affirmed.*