BURRELL OATES v. THE STATE.

No. 4339.    Decided June 23, 1909.

**1.—Murder—Appointment of Special Judge—Governor—Statutes Construed—Constitutional Law.**

The Act of the Legislature approved June 19, 1897, with reference to the appointment of special district judges is constitutional, and amends and partly repeals articles 1069 and 1070 of Revised Civil Statutes. Under the law of 1897 as it now stands the Governor has no authority to appoint a special district judge.

**2.—Same—Constitutional Law.**

The Constitutional requirement, section 11, article 5 of the Constitution of Texas, that district judges shall exchange districts when required by law is absolute and the law of 1897 supra is mandatory, and the right to agree upon a special district judge applies and is available only when the law fails to supply a judge not disqualified in the constitutional sense.

**3.—Same—District Judges—Exchange of Districts.**

District judges when elected shall under the regulations and rule fixed by law

try all cases pending in the court wherein they preside; for reasons being sufficient, and in the manner and by the person named by law they may be required under the Constitution to exchange districts; and under the law as it now stands, the constitutional provision that parties may agree upon a judge can not become effective until the judge of the district is disqualified and no exchange of district judges can be made on account of sickness or other reasons rendering such exchanges of judges impossible. Brooks, Judge, dissenting.

#### 4.—Same—Exchange of Judges.

The present law which requires the exchange of district judges, before the parties litigant can agree upon a special judge is a matter of public policy authorized by the Constitution, and can not be set aside by the court; and when such enforced exchange can not be made then, and only then, the constitutional right of parties litigant to agree upon a special judge is authorized.

#### 5.—Same—Rule of Construction.

See opinion for rule of construction of an act which is partly constitutional and partly not so.

#### 6.—Same—Rule of Construction.

The different clauses of section 11, article 5, of the Constitution of Texas should be construed as parts of the same general scheme of providing a trial judge in the absence or because of the disqualifications of the regular judge, and no significance should be attached to the order in which these provisions appear.

#### 7.—Same—Agreement by Parties on Special Judge.

In this case the constitutional right of parties litigant to agree on a special judge is not involved; nor is such right under proper conditions denied.

#### 8.—Same—Principle of De Facto Officer.

A person appointed as special district judge under articles 1069 and 1070 of the Revised Civil Statutes, after they were amended and partly repealed by the Act of 1897, is in no proper sense a de facto officer, and is wholly without authority; and a trial before him of a person accused of murder is a nullity.

#### 9.—Same—Misconduct of Jury.

Where upon trial for murder the motion for new trial set up the claim that the jury discussed in their retirement the former conviction of defendant and his codefendant, and the record showed that these matters added nothing to what the jurors already knew when they were accepted as jurors, and of which defendant was advised, there was no reversible error. Following Arnwine v. State, 54 Texas Crim. Rep., 213. Davidson, Presiding Judge, dissenting.

#### 10.—Same—Murder in the First Degree—Sufficiency of the Evidence—Death Penalty.

Where upon trial for murder the evidence showed that the defendant with another murdered the deceased in the act of committing robbery, the assessment of the death penalty is warranted.

#### 11.—Same—Special Venire—Jury Wheel—Constitutional Law—Jury Law.

The Act of the Thirtieth Legislature, page 269, authorizing the drawing of a jury under what is known as the jury wheel law is constitutional and valid. Following Smith v. State, 54 Texas Crim. Rep., 298, and other cases.

Appeal from the Criminal District Court of Dallas. Tried below before the Hon. Walter S. Lemmon, Special Judge.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*A. S. Baskett,* for appellant.—Cited cases in the opinion. A new

trial should be granted when the jury, upon retirement, has discussed the result of former trials of this case, as well as the result of the trial of the defendant's codefendant had at another time. Code Criminal Procedure, art. 823; Horn v. State, 50 Texas Crim. Rep., 404; 17 Texas Court Rep., 271; Casey v. State, 51 Texas Crim. Rep., 433; 102 S. W. Rep., 725; Morawitz v. State, 49 Texas Crim. Rep., 366; 91 S. W. Rep., 227; 15 Texas Court Rep., 880; Tutt v. State, 49 Texas Crim. Rep., 202; 91 S. W. Rep., 584; 15 Texas Court Rep., 38; Mitchell v. State (on rehearing), 36 Texas Crim. Rep., 305; Lankster v. State, 43 Texas Crim. Rep., 298; 65 S. W. Rep., 373; 3 Texas Court Rep., 437; Terry v. State, 38 S. W. Rep., 986; Darter v. State, 39 Texas Crim. Rep., 40; Tate v. State, 38 Texas Crim. Rep., 261; Gann v. State, 59 S. W. Rep., 896; Ysaguirre v. State, 42 Texas Crim. Rep., 253; 58 S. W. Rep., 1005; 1 Texas Court Rep., 97; Blocker v. State, 61 S. W. Rep., 391; 2 Texas Court Rep., 69.

*F. J. McCord,* Assistant Attorney-General, for the State.—Cited authorities in the opinion.

BROOKS, JUDGE.—The appellant was convicted in the District Court of Dallas County of the crime of murder in the first degree, and the penalty of death assessed against him by the jury. This is the fourth appeal of his case. The opinions of this court in the other appeals will be found in the following volumes: 48 Texas Crim. Rep., 131; 86 S. W. Rep., 769; 12 Texas Ct. Rep., 921; 50 Texas Crim. Rep., 39; 95 S. W., 105; 16 Texas Ct. Rep., 493; 51 Texas Crim. Rep., 449; 103 S. W., 859, where a full history of the case is given.

When the case came on to be tried last, Hon. W. W. Nelms was the judge of the Criminal District Court of Dallas County. He was disqualified to try the case, in that as assistant county attorney of Dallas County he had been engaged in the prosecution of appellant in a former trial, or former trials of this case. Thereupon he certified his disqualification to the Governor, who, being so advised, appointed Hon. W. S. Lemmon, a member of the Dallas bar, who was a private citizen, a practicing lawyer, but not a judge of any District Court in this State, to try this cause. Soon thereafter Mr. Lemmon took the usual and required oath of office, and proceeded to set the case for trial, ordered a special venire, over the drawing of which he presided under the provisions of the Act of the Thirtieth Legislature, applying to counties having a city or cities of more than twenty thousand population. Upon the call of the case for trial Mr. Lemmon, assuming to act as judge of the said Criminal District Court of Dallas County, the appellant, through his counsel, presented in limine his objection and exception to proceeding to trial in said case before the said Lemmon, as judge, and in effect urged a plea to the jurisdiction, right or authority of the said Lemmon to try said cause: First, calling in question the right and power of the Governor to appoint a practicing attorney to

act as special judge in his cause. This motion was overruled, and all the facts necessary to a decision of the validity of Lemmon's appointment, and his right to try the case, as judge, are preserved in and evidenced by the record. In line with this same contention, appellant moved to quash the venire theretofore summoned, because under the Constitution and laws of this State, Mr. Lemmon was not authorized to preside over the drawing of same, as well as for other reasons not necessary here to notice. This motion was also overruled, and appellant was compelled to submit to the trial of his case in said court before Mr. Lemmon as judge, and to select a jury from the venire drawn under his direction. Appellant excepted to this action of the court, and evidences the facts as to both motions or pleas by proper bill of exceptions. Indeed, there is no dispute about the facts, and we are confronted at the threshold of the case with the question as to whether, under the law as it existed at the time of the trial, the Governor of this State had the constitutional and legal right to appoint a practicing lawyer, not a district judge, as special judge to try a pending case, where the presiding judge of such court is disqualified.

On this question counsel for appellant submit the following proposition: "The Governor of the State of Texas has no authority in law to appoint a practicing lawyer as special district judge to try the cause where the presiding judge is disqualified; and such attempted appointment confers no power, authority or jurisdiction on such practicing lawyer to hear and determine any of the issues in said cause, or to preside over the trial thereof. The only power the Governor has in such cases is to direct the judge of some adjoining district to exchange benches with the judge of this court for the purposes of trying this cause."

Section 11 of article V of our State Constitution, insofar as it relates to district judges, is as follows: "When a judge of the District Court is disqualified by any of the causes above stated, the parties may, by consent, appoint a proper person to try said case, or, upon their failing to do so, a competent person may be appointed to try the same in the county where it is pending, in such manner as may be prescribed by law. And the district judges may exchange districts, or hold courts for each other, when they may deem it expedient, and shall do so when required by law."

It will be seen from this provision of the Constitution that parties have a constitutional right to agree upon a special judge without any legislation in reference to the matter. This was decided in the case of Parker County v. Jackson, 5 Texas Civ. App., 36.

Article 1069 of our Revised Civil Statutes of 1895 is as follows: "Appointment of judge by the Governor. Whenever a judge of the District Court is disqualified to try a civil case pending in any of the courts of his district, and the parties shall fail at the first term of the court to agree upon a special judge, it shall be the duty of the judge to certify to the Governor that he is disqualified to try

such case, and the failure of the parties to agree upon a proper person to try the same; whereupon the Governor shall proceed to appoint some person learned in the law to try such case.".

Article 1070 of the same chapter provides: "Appointment of judge—Additional provisions. Whenever any case or cases are called or pending in which the district judge, or the special judge chosen, as hereinbefore provided, shall be a party, or have an interest, or have been attorney, or of counsel, or otherwise disqualified from sitting in and trying the same, no change of venue shall be made necessary thereby; but the parties or their counsel shall have the right to select and agree upon an attorney of the courts for the trial thereof; and if the parties or their attorneys shall fail to select or agree upon an attorney for the trial of such case at or before the time it is called for trial, or if the trial of the case is pending, and the district judge should become unable to act, or is absent, and a special judge is selected who is disqualified to proceed with the trial, and the parties fail to select or agree upon a special judge who is qualified, at once, it shall be the duty of the district judge, or special judge presiding, to certify the fact to the Governor immediately, by telegram, mail or otherwise, whereupon the Governor shall appoint a special judge, not so disqualified, to try the same. The evidence of such appointment by the governor may be transmitted by telegram or otherwise. The special judge so appointed shall qualify as provided in section first of this act, and such special judge shall proceed to the trial or disposition of such case immediately, if the trial is pending, otherwise when called or reached, as in other cases."

Under the above and foregoing articles, the parties having failed to agree upon a special judge, it was the duty and the right of the Governor of this State to appoint Hon. Walter S. Lemmon special judge of said court to try said case.

Appellant insists that the Act of the Legislature, approved June 19, 1897, in terms repealed articles 1069 and 1070, above quoted, and that, under the law as it now exists, such power of appointment no longer exists. The law in question is as follows:

"Section 1. Be it enacted by the Legislature of the State of Texas: That articles 1069 and 1070 of the Revised Civil Statutes of the State of Texas be so amended as to hereafter read as follows:

"Article 1069. Whenever any case or cases, civil or criminal, are pending in which the district judge is disqualified from trying the same, no change of venue shall be made necessary thereby; but the judge presiding shall immediately certify that fact to the Governor, whereupon the Governor shall designate some district judge in an adjoining district to exchange and try such case or cases, and the Governor shall also notify both of said judges of such order, and it shall be the duty of said judges to exchange districts for the purpose of disposing of such case or cases, and in case of sickness or other reasons

rendering it impossible to exchange, then the parties or their counsel shall have the right to select or agree upon an attorney of the court for the trial thereof.

"Article 1070. Whenever a special judge is agreed upon by the parties for the trial of any particular cause, as above provided, the clerk shall enter in the minutes of the court, as a part of the proceedings in such cause, a record showing:

"1. That the judge of the court was disqualified to try the cause; and

"2. That such special judge (naming him) was by consent agreed upon by the parties to try the cause; and

"3. That the oath prescribed by law had been duly administered to such special judge.

"Section 2. That all laws and parts of laws in conflict with this act be, and the same are, hereby repealed.

"Section 3. The fact that under the present law there is a heavy annual expense entailed upon the State for the payment of special judges, which could be avoided by the regular district judges exchanging districts, creates an emergency and an imperative public necessity requiring that the constitutional rule requiring all bills to be read on three several days be suspended, and that this act take effect and be in force from and after its passage, and it is so enacted."

There can be no cavil over the question, as appellant insists that, if the last cited act is constitutional, that it repeals the preexisting law, and deprives the Governor of this State of the power to appoint a district judge in the manner and form as was done above, but we hold said act unconstitutional in that, by the terms and conditions of said Act of 1897, the parties are deprived of the right to agree upon a special judge. The reason for stating that said act is unconstitutional, which must always be done with great deference to the constitutional right of the Legislature to construe the Constitution as well as the courts, is this: The Act of 1897 deprives litigants of the right to agree upon a special judge to try their cases, which right is circumvented and destroyed by the statute in providing for an exchange of judges in lieu of the agreement. It is true that article 1070 of the act provides that litigants can agree on a judge, but this right is subordinated to and may be dependent upon another 'condition in the statute, to wit, the exchange of benches by the designation through the Governor of a judge of an adjoining district to try the case. If the Governor has the constitutional right to designate another judge to try the case, then he thereby becomes empowered with the right to destroy the constitutional privilege of litigants to agree upon a judge. The last cited article says that the reason for this legislation is that there is a heavy annual expense entailed upon the State for the payment of special judges, which could be avoided by the regular district judges exchanging districts, and this fact creates an imperative necessity requiring that the constitutional rule be suspended which requires

bills to be read on three several days. This enforces the idea that the Legislature intended, and it was its direct purpose, to repeal or abrogate, as near as they could, the constitutional right of litigants to agree upon a special judge. This being true, this clause of the statute is clearly unconstitutional; that is, the clause authorizing the substitution of a judge of an adjoining district in lieu of a judge agreed upon by the parties. There can be no cavil, we take it, as stated repeatedly, over the constitutional right of parties to agree upon a judge, and this article—that is, article 1069 of the Act of 1897—deprives litigants of their constitutional right. This being true, can the latter clause of the act remain, or can other provisions of the act remain? We say not, since it is a well-known rule, very aptly stated by Black in his work on Constitutional Law, page 65, as follows: "But when the parts of a statute are so mutually connected and dependent, as conditions, considerations or compensations for each other, as to warrant a belief that the Legislature intended them as a whole, and that, if all could not be carried into effect, the Legislature would not pass the residue independently, if some parts are unconstitutional and void, all the provisions which are thus dependent, conditional, or connected, must fall with them. But if the purpose of the statute is to accomplish a single object only, and some of its provisions are void, the whole must fall, unless sufficient remains to effect the object without the aid of the invalid portion. And if the unconstitutional clause can not be rejected without causing the statute to enact what the Legislature never intended, the whole statute must be adjudged invalid." See also Cooley on Constitutional Limitations, page 211, 6th ed., and Black on Construction of Statutes, page 96.

In the case of Texas & Pacific Railway Company v. Mahaffey, 98 Texas, 392, the Supreme Court of this State, in passing upon a similar question and laying down a similar rule of statutory construction, used the following language: "It seems to us that the main purpose of the act was to prohibit dealing in railroad tickets, which had been issued to travelers, and which for any reason remained, either in whole or in part, an outstanding obligation of a railroad company to carry a passenger. The scheme was to accomplish this object, and at the same time to avoid doing an injury to the holders of such tickets by requiring the railroad companies to redeem them. Therefore, by section 5 it was made the duty of the companies to redeem such tickets, and a penalty was provided for their failure to do so. For this reason we are of the opinion that the propriety of requiring the railroad companies to redeem unused tickets grew out of the provision which prohibited the sale of such tickets, and that, but for the enactment of section 3, section 5 would not have been passed. Therefore the two sections must fall together." Another portion of the opinion recites the fact that in the case of Jannin v. The State, 42 Texas Crim. Rep., 631, our Court of Criminal Appeals has held that section 3, providing a penalty

for the sale of a certain class of tickets, was unconstitutional. Of course, there could be no serious contention, under the well-settled authorities of this court, as well as the Supreme Court, that the judge who tried this case could not be a de facto judge. This has been settled by too many authorities and too numerous to mention. If his appointment was void, then he had no authority whatever to try this case. But we hold that he was a de jure judge, appointed under authority of an Act of the Legislature of 1895, above cited in this opinion, and that the Governor had a constitutional and statutory right to appoint him, and that his appointment in all things was formal. So believing, we think appellant's contention is incorrect, and that the Act of the Legislature last cited, containing other provisions than the one here under consideration, are also invalid, including the one under consideration, for the reason that the act as an entirety can not stand, since the Legislature would not have passed that part of the act here declared unconstitutional if they had known same was such, since the purpose of passing the law was to save expense. Most of the expense incident to special judges are those appointed or agreed on by the parties. This act eliminates the constitutional right to agree, and to that extent alone would save expense. So, no economy being obtained by other provisions of the statute, in view of the fact that the clause here under consideration is declared unconstitutional, we must presume that the Legislature would not have passed the rest of the act if they had known the provisions here were unconstitutional. We do not feel disposed to treat the matter further, but hold that the Act of 1897, authorizing district judges to be designated to hold court in adjoining districts, thereby depriving parties of the right to agree, is unconstitutional and void, and that the other provisions of the Act of 1897 are equally so for the reasons above stated.

Appellant's second assignment of error complains that the court erred in overruling appellant's motion to quash the special venire herein, on the ground that the law of the Thirtieth Legislature, page 269, authorizing the drawing of a jury under what is known as the jury-wheel law, is unconstitutional and void. This question has been passed upon by this court, and held adversely to appellant's contention, in the cases of Smith v. State, 54 Texas Crim. Rep., 298; 113 S. W. Rep., 289; Brown v. State, 54 Texas Crim. Rep., 121; 112 S. W., 80, and Waters v. State, 54 Texas Crim. Rep., 322; 114 S. W., 628.

Appellant insists that the court erred in refusing to grant him a new trial on account of the misconduct of the jury, in that the jury discussed the final results of the trial of Holly Vann, appellant's codefendant. The juror Vineyard testified as follows: "The jury retired to consider the case under the charge of the court on Wednesday afternoon, about 3 o'clock, and arrived at a verdict about 3:30 or 9 o'clock Friday morning. During the time the jury were deliberating on the case, and before a verdict was reached, some member of the jury—I think Mr. Laird, but won't be sure—said that Holly Vann had been

hung for this same offense, and that the evidence showed that the defendant was as guilty as Vann was. Sometime during that time the jury were deliberating, and before the verdict was reached, some of the jury, I don't remember who, said this was the fourth trial of this case—that it had been tried three times —and that he had received the death penalty each time. I don't remember who said it. I never heard anything said about the failure of the defendant to testify, nor about his former character or career."

Whereupon, on this issue being joined, A. S. Baskett was sworn for the State, and testified: "I think I examined each juror as to whether he heard of the result of the Holly Vann case, and of this case on any former trial. My recollection is that some of them had heard of both, but a number had heard of neither. The juror Williams had not heard of either. The juror Sturgess had heard of the result of the Vann case, but my recollection is he had not heard of the result of this case. Each one that was taken that had heard of either one swore that that would not influence them in arriving at a verdict in this case. That they could try the defendant according to the evidence and charge of the court as fairly as if they had not heard of it." Mr. Baskett was attorney for appellant upon the trial of the case as well as in this court.

E. A. Sturgess, being sworn for the State, testified: "I sat on the jury in the Burrel Oates case in this court in October. I was elected foreman of that jury. When I was taken I had heard of the result of the Holly Vann case and the result of this case on the former trials. I told the attorneys and court so at the time. The jury went out with the charge of the court one afternoon about three o'clock. They elected me foreman. We then took a ballot on guilty or not guilty. The first ballot which was taken the first evening was twelve for guilty. Then we voted on the punishment. There were nine for the death penalty and three for life sentence. I was one of the three for life sentence. The other two were Burkhead and Christenson. We took several ballots that evening without any change. The next morning Mr. Burkhead and Mr. Christenson went over to the death penalty. We stood then eleven for the death penalty and one for life. We stood that way all that day, and until the following morning, when I agreed to the death penalty. Yes, I heard the result of this case on the former trials discussed in the jury room by several of the jurors, but I don't remember the names of but one. I remember his name because he spoke of it five or six times. That was after Mr. Burkhead and Mr. Christenson had gone over to the death penalty. It occurred on the second day. It was before I agreed to the death penalty. When it was spoken of I told them it had nothing to do with this case. It did not influence me in my verdict. I made up my verdict from the law and the evidence. Every time it was mentioned I told them it had nothing to do with this case, and that I was foreman of that room and they must not discuss it. The result of the Vann case was also mentioned by the same juror. That was while the jury stood eleven to one. That

did not influence me." Cross-examined by the defendant, Sturgess testified: "That the juror who spoke of the former verdicts in this case so often was Mr. Laird. I hate to tell it, but if I have to I will. All the remarks were made to me. I was the only one of them that was standing off for a life sentence. As soon as I came over to the death penalty we returned the verdict. That was Friday morning about 9 o'clock. That juror said the defendant had already been tried three times, and had received the death penalty each time. I told him it did not make any difference how many times he had been tried—that had nothing to do with this trial. He said forty-seven men had said he ought to be hung, and one was saying he ought to be sent to the penitentiary; that I was putting my judgment against forty-seven. I told him it made no difference if ninety-nine said he ought to be hung. That had nothing to do with it. He kept on, and finally threw some sort of a slur at me, and we liked to have had a circumstance there in the jury room. I told him it had nothing to do with this case; that he must not be slurring at me, I would not stand it; that I was foreman of that room, and they must not discuss that matter any more. I never heard it mentioned any more. That was on Thursday. Yes, I heard this same man, Laird, speak of the result of the Vann case. He said there in the jury room, while we were considering of our verdict, that Holly Vann had been hung for this same thing, and what would the people of Dallas County think of us if we should send the negro to the penitentiary after the white man had been hung. That happened before I agreed to the death verdict. That was on Thursday, but after Burkhead and Christenson had agreed to the death verdict. That was spoken to me. I heard Mr. Williams, one of the jurors, say, 'I wish the defendant had gone on the stand and testified. He might have cleared up some circumstances.' That was all that I heard said about the failure of the defendant to testify. This all occurred in the jury room while we were deliberating on our verdict, and before we reached a verdict. I never heard anything said about the former life or character of the defendant."

This is all the testimony that was introduced on the trial of this issue. It appears from the foregoing statement that the foreman of the jury held out for quite a while for life sentence. He further states in his testimony that he knew of the previous verdicts, and so stated at the time he was taken on the jury. We do not think, in the light of this statement, and the balance of the testimony above detailed, there was any such comment upon either the failure of the defendant to testify or the existence of previous verdicts as will authorize us to reverse this case. We have several times held lately that bare allusions to these matters will not operate a reversal of the case. We do not believe there was anything here stated that would justify us in so doing. See Arnwine v. State, 54 Texas Crim. Rep., 213, decided at the recent Tyler term.

The only remaining question for our consideration is the sufficiency

of the evidence. To our minds it in all respects measures up to the requirements of the law for the infliction of the death penalty. That appellant, in company with Holly Vann, murdered the deceased, Sol Aranoff, the evidence excludes every reasonable doubt of; that they murdered Sol Aranoff in order to secure his money is also· beyond cavil. The jury have seen fit four several times to inflict upon appellant the death penalty, and we believe his conduct, and the circumstances surrounding it, and the mode, animus and purpose actuating him at the time of the commission of this offense, clearly justify the jury in their verdict. The judgment is in all things affirmed.

*Affirmed.*

RAMSEY, JUDGE (dissenting.)—The majority of the court having determined that the Governor is authorized, under the law, to appoint a special district judge, I will at some convenient time write my views. My opinion is that the Governor is not authorized in any case to appoint a special district judge. I will at some convenient time write my views on this question.

DAVIDSON, PRESIDING JUDGE (dissenting).—I concur in the disposition made of the question in regard to the appointment of a special judge, believing the law relied upon by appellant to be unconstitutional, and, therefore, the Governor had a right to appoint, as he did, the special judge in this case.

In regard to the jury-law question suggested for revision, I have heretofore expressed my views in a dissenting opinion in the case of Bob Smith v. State, 54 Texas Crim. Rep., 298; 113 S. W., 289, and think my position on that question sufficiently explicit.

I can not agree with my brethren in regard to the matters suggested in the motion for a new trial as to the misconduct of the jury, and matters discussed by them during their retirement, and think they are of such material character as should have required the district judge to grant a new trial, and, upon his failure to do so, this court should reverse the judgment. See Lankster v. State, 43 Texas Crim. Rep., 298; Hughes v. State, 44 Texas Crim. Rep., 296; Horn v. State, 50 Texas Crim. Rep., 404; 17 Texas Ct. Rep., 271; Casey v. State, 51 Texas Crim. Rep., 433; 102 S. W., 725; Morawitz v. State, 49 Texas Crim. Rep., 366; 15 Texas Ct. Rep., 880; Tutt v. State, 49 Texas Crim. Rep., 202; 15 Texas Ct. Rep., 38; Terry v. State, 38 S. W., 986; Tate v. State, 38 Texas Crim. Rep., 261; Gan v. State, 59 S. W., 896; Blocker v. State, 61 S. W., 391; Darter v. State, 39 Texas Crim. Rep., 40.

In the case of Horn v. State, *supra,* before the jury had agreed on the penalty to be assessed against appellant—that is, the number of years—the conviction of his codefendant, Jack Early, was discussed. Early had been previously convicted, in a separate case, for the same offense, and had been given fifteen years, and the matter of his pun-

ishment was discussed in the jury room, and this was assigned as error. After such discussion they agreed on the punishment, and assessed it at thirty years confinement in the penitentiary. This language is found in the opinion: "We do not believe that what occurred can be considered as a bare reference to the matter, but was more than this. Evidently it suggests that the juror or jurors who may have used this argument must have had some prejudice against appellant, otherwise they would not have referred to it. It might not have disqualified a juror who knew this fact, but if a juror not only knew the fact, but used it, this, it occurs to us, shows he was influenced thereby himself, and resorted to it for the purpose of influencing others. Appellant's contention here is supported by an unbroken line of authorities in this State, and is of itself sufficient to reverse this cause." Judge Henderson wrote the opinion.

In Hughes v. State, 43 Texas Crim. Rep., 511, this language is found: "This misconduct is so reprehensible, and is so fraught with probable injury to the rights of appellant, that we can not say that it was not calculated to injure his rights. Instead of a fair and impartial judgment by the jury upon the facts, and conclusion from those facts as to the punishment that the law authorized to be meted out to appellant, we have a verdict predicated probably upon the supposed action, in part, at least, of a former jury. This is not a fair trial under the laws of this State, nor is it a deduction from the evidence. We can not permit such a verdict to stand."

In the case of Hughes v. State, 44 Texas Crim. Rep., 296, the court uses this language: "The statute is imperative, and must be followed, which says that the jury shall not discuss or use the fact of previous conviction as a predicate or probable predicate for their verdict. It is true, as indicated by the court, that each of the jurors stated that the discussion of the Denton County verdicts did not influence their action in finding the verdict. This is a conclusion so wrought with speculation and caprice that we can not make it the basis of holding appellant was accorded a fair and impartial trial." Judge Brooks delivered the opinion in both of the cases of Hughes v. State, *supra*. They are in accord with the writer's views and enunciate the correct doctrine.

In the case of Lankster v. State, *supra,* there had been two former trials and convictions. The jury, after their retirement, after agreeing upon a verdict of guilty, but before assessing the punishment, discussed the previous convictions and punishment. The court held the jury were guilty of misconduct, and the bare fact that this misconduct was of a character calculated to injuriously affect defendant constituted reversible error, and the judgment for this reason alone was reversed.

The statement in the opinion as to what occurred in the jury room is taken as a basis for my dissent, and as having fairly and correctly stated the conduct of the jury during their retirement. It will be observed from that statement that not only the prior convictions of

appellant were discussed and urged as a reason why he should not be acquitted, but it was further stated and urged, as a reason why the conviction for death penalty should obtain, that a white man, Holly Vann, had been previously convicted and hanged for the same offense, and that this appellant had had three death penalties prior to this assessed against him for this offense. And in this connection the pungent question was asked, "What would the people of Dallas County think of this jury if they were to send a negro to the penitentiary for the same offense for which a white man had been hung?" Then it is patent that the previous conviction of Vann was mentioned and urged, previous convictions of appellant were used, the fact that he was a negro and Vann was a white man emphasized, the probable censure of the people of Dallas of the jury if they should fail to hang this negro was pleaded, and to such an extent that it almost reached the point of a personal difficulty between the juror Sturgess and some other member of the jury. That the juror may, under such circumstances, say that he is not influenced, does not necessarily control this matter, but may, in fact, tend to show prejudice, as was stated in some of the opinions above quoted. Nor was this all. Before the verdict was reached one of the jurors expressed the wish, or stated in substance, that he wished the appellant had taken the stand; that, had he done so, he might have explained a lot of matters occurring at the homicide. This was not *merely a bare* allusion to the fact that appellant did not testify. It was more than that. There were things in the mind of the juror that needed explanation, and the appellant failed to take the stand to explain those in accordance with the wish of the juror. They were evidently not explained, and appellant was held responsible to the limit of the law. To the mind of the writer this conduct was of such character that the judgment ought to be reversed. In fact, it is seldom the case that such conduct occurs in the jury room. Without going further into a discussion of these matters, I suggest briefly the above reasons for my dissent, and respectfully nonconcur, and rely in part upon the authorities above cited, though quite a number more might be added.

### ON REHEARING.

#### June 23, 1909.

RAMSEY, JUDGE.—This case has been pending in the courts for many years and has attracted wide notoriety. The appellant has four times received in the trial court the death penalty, and his case has already been three times reversed by this court. With the other reversals I have personally nothing to do, since they all occurred before I had the honor to sit as a member of this court. I am by law, however, charged with the responsibility for the result of this appeal. I am clear and firm in my belief that the Governor has no authority to appoint a special district judge in this State anywhere or under any circumstances. It is, of course, greatly to be regretted that we should

be compelled so to decide. The Governor is by law charged with the enforcement of the law. He is, as we know, a lawyer of large experience and recognized distinction. In addition, in this case, we are advised that he has acted on the written opinion of the Attorney-General. If, therefore, we could set aside our own responsibility, and place our decision on the authority of these officers, our decision were an easy matter. But by law *we* must pass on and decide questions raised on the appeal of criminal cases. It is a responsibility we can not share with another. It is ours, and we must recognize and discharge it, although our decision conflicts with the opinions of others whose judgment is entitled to respect, and although it results in the reversal of a judgment of conviction the fourth or even the forty-fourth time. If the tribunal which condemned this man to die was not presided over by a district judge duly chosen and selected according to law, it had no more legal right to take his life, guilty or innocent, than a mob at night. There can be no court, in a legal sense, without a judge, and there can be no judge except as he may be elected and chosen under the Constitution, and agreeably to law. It, therefore, results that, however eminent in learning, and however fair in fact, may be the person who presides over the trial, unless he is in a legal sense a district judge the gathering, masquerading as a court, becomes of no higher dignity than the same number of respectable gentlemen gathered by chance on the street corner.

It is conceded, in the original opinion filed in the case, that if the Act of the Legislature approved June 19, 1897, is constitutional, that there exists in this State no authority in the Governor to appoint a special judge. There can be no doubt of the correctness of that position. This act repeals articles 1069 and 1070 of the Revised Civil Statutes, which had given the authority to make such appointment. The Act of 1897, denying in express terms the authority to make such appointment, has now been on the statute books of this State for more than a dozen years. No court in this State has, until the decision in this case, held it invalid. Here is a man, a negro, to be sure, and probably a very guilty negro, who, by his counsel, stands up and demands the priceless heritage of a free man, to be tried according to the law of the land, and by a judge chosen and selected in accordance with the laws of his country. He relies on a statute passed with the set purpose and deliberate intention of denying to the Governor the authority to appoint a district judge from private life to try his case. In such a case, unless it is clear almost beyond the peradventure of a doubt that such law of my country is unconstitutional, I would never be as one standing by and consenting to his death. I can not see, and do not believe, that this act is unconstitutional. To consent that it shall be so declared is to abdicate my position as a member of this high tribunal, or commit the unpardonable offense of refusing to speak out when every suggestion of honor and every consideration of public duty demands that I shall speak. But is the act in question unconstitu-

tional? We ought not so to hold except on such weight of authority or compulsion of reason as to leave the matter substantially free from doubt. The rule is elementary, and the authorities unbroken, that we ought, if possible, to sustain this law. A large deference should be paid to a statute duly enacted. · The same electorate which chooses us elects the Legislature. It is one of the three great departments of our government. This act seems to have been carefully drawn, and received the approval of a Governor whom envy itself would not deny the praise of a great lawyer. Again, through all these years it has remained on the statute book of the State, and is now a part of the statute law of this State. Again, it relates to a matter of procedure in our courts in the trial of cases both civil and criminal. What article of our Constitution does it offend? Let us see. The original opinion does not quote all of section 11, article 5 of our Constitution, relating to district judges. The section (so far as is important here) is as follows: "When a judge of the District Court is disqualified by any of the causes above stated, the parties may, by consent, appoint a proper person to try said case, or upon their failing to do so a competent person may be appointed to try the same in the county where it is pending, in such manner as may be prescribed by law. And the district judges may exchange districts, or hold courts for each other when they may deem it expedient, and shall do so when required by law. The disqualification of judges of inferior tribunals shall be remedied, and vacancies in their offices filled, as may be prescribed by law." As stated in the original opinion, the portion of the above quoted section of the Constitution giving parties the right to agree on a special judge is self-executing, absolute, and is perfect even in the absence of legislation in respect to the matter. Parker County v. Jackson, 5 Texas Civ. App., 36. But it is the only portion of the constitutional provision which is, by its terms, absolute. As to appointment, the language is, "a competent person may be appointed to try the same in the county where it is pending, in such manner as may be prescribed by *law*." Again, the last clause provides that "the disqualification of judges of inferior tribunals shall be remedied, and vacancies in their offices filled, as may be prescribed by law." Again, the Constitution says: "And the district judges *may* exchange districts, or. hold courts for each other when they may deem it expedient, and *shall* do so when required by law." Every district judge in Texas is chosen with reference to, and presumably with a knowledge of the constitutional provision. That he may be required and compelled to exchange districts under such regulation, and by such directions as the law provides, does not to my mind admit of any doubt. Now then, as I conceive the error in the majority opinion, consists in this: (1) The present statute does recognize the right of parties to agree on a judge, when the law fails to provide one duly elected and serving at the salary fixed by law. It in terms provides that, "in case of sickness or other reasons rendering it impossible to exchange, then the parties or their counsel shall have the right to

select or agree upon an attorney of the court for the trial thereof." Thus it is obvious, as I believe, that the existing law does authorize and recognize the right given by the Constitution to agree upon a judge. The right to voluntarily exchange districts and the right to require such exchange is fixed and granted in the same section of the Constitution as that which guarantees the right to agree on a trial judge. One is of no more importance or dignity than the other. They may and do both exist in the same section, and dwell together in harmony under the same shelter. They both, when properly construed, mean this, and no more than this: District judges, when elected, shall under the regulations and rules fixed by law try all cases pending in the courts wherein they preside. For reasons deemed sufficient, and in the manner and by the person named by law, they may be required to exchange. When no judge elected in the particular district appears qualified to try the case, and when no duly elected judge on proper exchange appears, then, since the law fails to supply a duly elected officer, the constitutional provision is effective and available, and the right to select a judge by agreement is granted. Let us see if this is not the true and clear intent of the Constitution. In the first place, society and the public have some rights. They are interested as well as the immediate parties in the proper administration of justice. They are interested in the integrity and tried capacity of the judges. The law and the State has the right to say to the litigant: Here is a judge possessing the qualification of the Constitution, and approved and chosen by the voters of his district. To him the law requires you to submit your case for decision. The same Constitution, too, provides that, to prevent delay or the denial of a prompt hearing, and the due administration of justice, that a system of exchange may be arranged and provided by law. Then, too, the public and society at large have some rights in the matter of expense. If, and when provision is made for the prompt and orderly trial of cases by judges duly chosen and serving at a fixed salary to be paid in any event, shall it be held that these officers may be thrust aside and private persons chosen at public expense to do their work, because for any reason it may suit litigants better? The error of the majority, as I conceive, is found in the fact that they do not recognize, which seems to me to be clear, that the Constitutional right of agreement applies and obtains only when the law fails to supply a judge duly chosen. If this constitutional right is superior to the other constitutional provisions contained in the same section, and is available at all times and under all circumstances, its application would, or at least could, be made an instrument and means of judicial anarchy. Under my construction, that the constitutional right to agree upon a district judge applies and is available only when the law fails to supply a judge not disqualified in the constitutional sense, perfect harmony in our judicial system is assured. Again, the makers of our Constitution recognized that men must first be lawyers before they could become judges. Slight reflection under our fre-

quent change of judges would have suggested, and obviously did suggest to them, that these practicing lawyers called from the bar to the bench on short notice would be disqualified from having been counsel, and for other reasons, in many cases pending before them, and the consequent necessity of making provision for furnishing the courts and litigants with duly chosen judges to try, under a system of exchange, cases in which the regular judge of the district was disqualified. Let us suppose that either voluntarily, or under direction of the Governor in the manner prescribed by law, the district judge of Travis County, to secure the trial of a case in which he is recused, exchanges benches with the district judge of the neighboring county of Fayette. That learned judge duly accredited appears at the time stated, takes his seat on the bench, and begins the call of the docket. He is met with the announcement that the parties litigant in all the cases triable before him have agreed on another person or other persons to try such cases. A similar course may be pursued in Fayette County. Can they be thus ousted from their jurisdiction and be set aside at the whim and caprice of litigants, and the public burdened with the expense of a special judge, when under sanction, both of the Constitution and the statute of our State, there is present a duly elected and qualified judge, ready, able and willing to hold court and try the cases set for hearing, without even a suggestion of disqualification? I can not think so. Now, remember that the Constitution prescribes that "the district judges may exchange districts or hold courts for each other when they may deem it expedient, and *shall* do so when *required* by law." Now, article 1069, as fixed by the Act of June 19, 1897, undertook to carry into effect the constitutional provision of enforced exchanges. This the Legislature had the right to do. Evidently they believed that the public good so required. This was, and is, a matter of public policy, which, since authorized by the Constitution, we ought not, and can not, control or set aside. In this very act, too, they provide for, and in express terms recognize, the right of litigants to agree on a special judge, and also make provision for his induction into office, and prescribe the manner and method of his qualification and the preservation of the authentic evidence thereof. If the act denied the authority in a proper case to have a judgment by agreement, the question would be more serious. But here, so far from denying such right, it is both granted and recognized in express terms. It is granted in case where the regular judge is disqualified, and where for sickness or other reasons rendering it impossible to exchange, and where, as a result of the failure of the law to supply a judge, the right to have one by agreement becomes available. Section 3 of the act in question furnishes a key to its own proper interpretation. It says: "The fact that, under the present law, there is a heavy annual expense entailed upon the State for the payment of special judges, which could be avoided by the regular district judges exchanging," etc. Thus we have here a plain statement of the purpose of the law. It undertakes, among other things, (1) to authorize the

Governor, on receipt of evidence of the disqualification of any district judge, "to designate some district judge in an adjoining district to exchange districts for the purpose of disposing of such case or cases;" (2) it provides, in case of such disqualification of the district judge, and where circumstances are of a character "rendering it impossible to exchange," that the parties or their counsel shall have the right to select or agree upon an attorney of the court for the trial thereof. (3) It provides the manner of evidencing the proper qualification of the special judge chosen by the parties. (4) Most important of all, it omits what has formerly been in terms provided for, any authority giving power to the Governor to appoint a special district judge in any case. (5) In the emergency clause it sets out the reasons for the enactment of the law.

I should be content to rest the decision on the above ground, but there is another basis for my conclusion, which is so forcibly and clearly expressed in appellant's motion for rehearing that I adopt it without change as my own views:

"Then, granting that the latter clause of the statute of 1897 is, by reason of its position, unconstitutional, does it necessarily follow that the remainder of said act is? We say not. This court quotes from Black and Cooley on Constitutional Limitations. The language of the two authors is practically identical. The quotation is as follows: 'But when the parts of a statute are so mutually connected and dependent, as conditions, considerations, or compensations for each other, as to warrant the belief that the Legislature intended them as a whole, and that, if all could not be carried into effect, the Legislature would not have passed the residue independently, if some parts are unconstitutional and void, all the provisions which are thus dependent, conditional or connected, must fall with them. But if the purpose of the statute is to accomplish a single object only, and some of its provisions are void, the whole must fall, *unless sufficient remains to effect the object without the aid of the invalid portion.* And if the unconstitutional clause can not be rejected without causing the statute to enact what the Legislature never intended, the whole must be adjudged invalid.' That same authority, on page 211, further says, in that connection: 'If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must be sustained.' Again, on page 214, he says: 'If there are any exceptions to this rule they must be of cases only where it is evident, from a contemplation of the statute and of the purpose to be accomplished by it, that it would not have been passed at all, except as an entirety, and that the general purpose of the Legislature will be defeated if it shall be held valid as to some cases and void as to others.' Again, the same author, on page 215 of said work, as quoted by the Supreme Court of Texas in Western U. Tel. Co. v. The State of Texas, in 62 Texas Rep., on page 634: 'When, therefore, a part of a statute is

unconstitutional, that fact does not authorize the courts to declare the remainder void also, unless all the provisions are connected in subject matter, dependent on each other, operating together for the same purpose, or otherwise so connected together in meaning that it can not be presumed the Legislature would have passed the one without the other. The constitutional and unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand though the last fall. The point is not whether they are contained in the same section, for the distribution into sections is purely artificial, but whether they are essentially and inseparably connected in substance. *If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must stand.'* Now, tested by these rules, must the first portion of the Act of 1897 fall because the second portion is unconstitutional? We can not see why or where. Is one a condition of the other? If so, which is the condition of or for the other? One had been in operation from its own force since 1876; the other was enacted by virtue of an entirely different power granted by the Constitution. Was one of them a consideration or compensation for the other, as it was held in the case of the Texas & P. Ry. Co. v. Mahaffey, in 98 Texas, 392, cited by this court, in which it was held that that portion of the statute requiring the railroads to redeem tickets was a consideration or compensation for the legislation providing a penalty for scalping in railroad tickets? If so, which is the condition or compensation for the other? Should the latter clause be stricken out as unconstitutional, would what remains be what the Legislature intended? What remained would be that the Governor should not be permitted to appoint judges, and thus increase the expenses of the judiciary, but should designate district judges to exchange benches, and thus eliminate that expense. The Legislature evidently so intended, because the purpose of the act was economy in that line. This act had a single object, viz.: economy. Now, the whole must fall 'unless sufficient remains to effect the object without the aid of the invalid portion.' Economy, the purpose of the bill, is attained in all cases where a special judge is not agreed on. That is the effect, without the aid of, and in spite of the latter clause. Would the Legislature have passed the first part without the latter, or unconstitutional clause? The purpose of the act, as stated in the emergency clause, was economy. This court says, in its opinion, that, because most special judges were agreed upon, and, therefore, most of the expenses come from that source, therefore it is reasonable to conclude that the Legislature would not have attempted any retrenchment at all had it known it could not have gone through the entire subject. That conclusion does not seem even plausible. It was absolutely beyond the power of the Legislature to retrench in that particular. The Legislature is supposed to have known that. Then, would you presume

they would undertake no retrenchments at all simply because there were some they could not effect? Then if these clauses are not mutually connected, nor dependent, are not conditions, considerations nor compensations of each other, one may be carried into effect without the aid of the other, one may be rejected without causing the other to enact what the Legislature never intended, and one of them might have been passed by the Legislature without the other, then it occurs to us that every constitutional objection to declaring the one unconstitutional and sustaining the other has been fully met. But let us follow the author a little further. He says, 'If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, *it must stand.*' The remaining portion, after eliminating the last clause, is as follows: 'Whenever any case, or cases, civil or criminal, are pending in which the district judge is disqualified from trying the same, no change of venue shall be made necessary thereby; but the judge presiding shall immediately notify that fact to the Governor, whereupon the Governor shall designate some district judge in an adjoining district to exchange and try such case or cases, and the Governor shall also notify both of said judges of said order, and it shall be the duty of said judges to exchange districts for the purpose of disposing of such case or cases.' Is that not complete within itself? If not, what is lacking? Is it not capable of being fully executed in accordance with the expressed legislative intent, economy, wholly independent of either the rejected part, or any other statute, as to that matter? If not, in what respect is it lacking? We contend that, by no rule laid down by Mr. Cooley, must the first clause fall perforce the fact that the last clause is unconstitutional. We further contend that that provision, as contained in the Act of 1879, has no force, and is as injurious to the statute, coming at the first, as it is in the Act of 1897, coming at the last. It has no force anywhere. We think this assignment is well taken, and that the appellant was tried without a legally constituted judge. That in that respect he is deprived of his life without due process of the law of the land. That he has been deprived of his rights under the Fourteenth Amendment to the Federal Constitution."

It seems to be thought that, inasmuch as the provision of the Constitution in respect to the right of parties to agree on a judge precedes, in the section quoted, the clause in reference to appointment, and the matter of exchange of judges, both voluntary and enforced, that it is paramount, and in a sense exclusive, and superior to these wise and important provisions. I have rather been inclined to construe them as parts of the same general scheme of providing a trial judge in the absence or because of the disqualification of the regular judge, and that no significance is to be attached to the order in which these provisions appear. I have endeavored, in interpreting this section of our Constitution, to follow the rule laid down by Cooley in his great work on

Constitutional Limitations, which is as follows: "Nor is it lightly to be inferred that any portion of a written law is so ambiguous as to require extrinsic aid in its construction. Every such instrument is adopted as a whole, and a clause which, standing by itself, might seem of doubtful import, may yet be made plain by comparison with other classes or portions of the same law. It is, therefore, a very proper rule of construction, that *the whole is to be examined with a view to arriving at the true intention of each part;* and this Sir Edward Coke regards as the most natural and genuine method of expounding a statute. If any section of a law be intricate, obscure or doubtful, the proper mode of discovering its true meaning is by comparing it with the other sections, and finding out the sense of one clause by the words or obvious intent of another. And in making this comparison it is not to be supposed that any words have been employed without occasion, or without intent that they should have effect as part of the law. The rule applicable here is, that *effect is to be given, if possible, to the whole instrument,* and to every section and clause. If different portions seem to conflict, the courts must harmonize them, if practicable, and must lean in favor of a construction which will render every word operative, rather than one which may make some words idle and nugatory. This rule is applicable with special force to written constitutions, in which the people will be presumed to have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, leaving as little as possible to implication. It is scarcely conceivable that a case can arise where a court would be justified in declaring any portion of a written constitution nugatory because of ambiguity. One part may qualify another, so as to restrict its operation, or apply it otherwise than the natural construction would require if it stood by itself; but one part is not to be allowed to defeat another, if by any reasonable construction the two can be made to stand together."

Again, it should be remembered that this is not a case in which a citizen is asserting the constitutional right to agree on a judge to try his case. If such a case were presented, and we had before us the appellant, asserting his right to be tried before a special judge on whom, with counsel for the State he had in a proper manner agreed, and who had accepted the trust, and qualified as by law provided, then, indeed, the question would be presented that he had been denied the constitutional right to be tried by a judge selected and agreed on under the terms of the Constitution. But here no such right is asserted by him. Nor should or can we say that the law is invalid as to him because he has not raised a question or asserted a right which we may think he might have asserted.

Nor can it be said that Mr. Lemmon, who assumed to preside as judge, was in any proper sense a de facto officer. If the Act of 1897 is valid, then the Governor was wholly without warrant to appoint him as special judge to try this case. Cooley defines a de facto officer

as one "who, by some color of right, is in possession of an office, and for the time being performs its duties with public acquiescence, though having no right in fact." An intruder, he defines as one "who attempts to perform the duties of an office without authority of law, and without the support of public acquiescence." "No one," he says, "is under obligation to recognize or respect the acts of an intruder, and for all legal purposes they are absolutely void." Cooley, Const. Lim., p. 751; Plymouth v. Painter, 17 Conn., 585; Peck v. Holcombe, 3 Port., 329; Petersilia v. Stone, 119 Mass., 465. The matter has been so ruled in our own courts. Franco Texas Land Co. v. Laigle, 59 Texas, 339; Brumby v. Boyd, 66 S. W. Rep., 874; Cox v. Houston & T. C. Ry. Co., 4 S. W. Rep., 456; Weatherford v. State, 31 Texas Crim. Rep., 530; 21 S. W. Rep., 251. In Brumby v. Boyd, *supra,* the court say: "When an appointment to office is not merely irregular or informal, but is absolutely void, the appointee, though attempting to discharge the duties of the office, is not an officer de facto. That one whose claim to an office is under a void appointment is not a de facto officer, but a mere intruder, is well settled." In the earlier case of Franco Land Co. v. Laigle, 59 Texas, 339, the court uses this language: "A de facto authority can not arise when there has been absolutely no election or appointment, or what is equivalent, one that is absolutely null and void, and not merely irregular or informal." If these views are correct, then appellant has been denied the right to be tried by a judge selected under the law, and has been forced to submit his case before one assuming to act as judge, but who was in truth a mere intruder. He is sought to be convicted for an offense against the laws of his State. To this law and its guaranties he makes appeal. If this is to be denied, and his life taken under the judgment of a tribunal unknown to the law, I want it written in the books and the record to show that I had in the most solemn and earnest manner protested against his condemnation by an extra-judicial tribunal. If these views are incorrect, then, as I believe, there is no other question raised in the record on which we ought to reverse the case. I think the evidence shows him guilty beyond doubt. We have heretofore upheld the validity of the jury-wheel law, and this course has been followed and approved by our Supreme Court on a refusal of a writ of error. I share in the views of Judge Brooks on the issue of the alleged misconduct of the jury, and assume my full share of the responsibility for the conclusion on this question, as stated in the original petition. The length of this opinion, and the fact that we are so soon to adjourn, and the pressure of many cases and questions, prevent my going into the matter at length. Ordinarily, I would be disposed to coincide with the conclusion at which Judge Davidson arrives, but under the facts of this case the general rule has, as I conceive, little or no application. Here the only jurors who could possibly, under the evidence, have been influenced by the discussion and happenings in the jury room, knew, when taken as jurors, every fact mentioned in their discussions, and this fact was

well known to appellant and his counsel when they were accepted as jurors. These jurors knew of the former convictions of appellant and the conviction, and presumably execution, of Holly Vann. With knowledge of these facts they were voluntarily accepted as triers of his case. Notwithstanding such knowledge, they declared they could and would give him a fair and impartial trial. The mention of these matters in the jury room adds nothing to what they already knew, and of which appellant was fully advised when he accepted them as jurors. I think the Arnwine case, *supra,* is directly in point, and that there was no reason, under the entire evidence, why, on this account, a new trial should have been granted.

Judge Davidson agrees that the motion shall be granted, which is now done, and the judgment of conviction is reversed and the cause remanded. He will write his views separately.

*Reversed and remanded.*

BROOKS, JUDGE, dissents.

DAVIDSON, PRESIDING JUDGE.—When I concurred with Judge Brooks in affirming the judgment in regard to the error assigned on the want of authority in the Governor to appoint a special judge to try appellant, I was under the impression that the present law in regard to the matter was unconstitutional, and, therefore, the old law would obtain, under which it was provided that the Governor could, under certain emergencies, appoint a special judge. A very cogent motion for rehearing was filed. A more careful review of the matter, and a more thorough discussion in consultation, has led me to believe that I was in error, and to reach the conclusion that the present law is constitutional. Under this view I agree with the conclusions reached by my Brother Ramsey, that the Governor was not authorized to make the appointment of the special judge. I therefore, on this phase of the case, agree with the conclusion reached by my Brother Ramsey, and concur in the reversal. I am still firmly of the opinion, however, that the judgment should be reversed also on account of the misconduct of the jury, as expressed in my dissenting opinion. I do not care to go into a discussion of either question, and simply state this much in view of the fact that I have reached the conclusion I was in error in regard to the appointment of a special judge.

I therefore concur in the reversal of the judgment.